[No. 26189-1-III.   Division Three.   July 8, 2008.]

CARRIE KRAFT, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Donna L. Beatty*, for appellant.

*Robert M. McKenna, Attorney General,* and *Amy S. Mickey, Assistant,* for respondent.

¶1 SCHULTHEIS, C.J. — Carrie Kraft appeals a decision by the Spokane County Superior Court affirming a Department of Social and Health Services (DSHS) determination that she mentally abused a vulnerable adult under chapter 74.34 RCW. She contends that (1) proof by a "preponderance of the evidence" does not satisfy due process when an agency decision deprives a person of her chosen livelihood and (2) the evidence does not support a finding that she mentally abused a vulnerable adult. We reject her contentions and affirm.

## FACTS

¶2 Haven Homes, a residential facility for disabled adults, employed Carrie Kraft as a program manager. K. was a 41-year-old resident of Haven Homes and a client of the DSHS's Division of Developmental Disabilities. She was diagnosed with bipolar disorder, borderline personality disorder traits, posttraumatic stress disorder, and mild

retardation. K. was focused on returning home to live with her parents near the Tri-Cities. This resulted in a history of waking up during the night and leaving the facility. Because of this, K. resided in a community protection program that had alarms on its windows and doors.

¶3 In October 2003, Ms. Kraft became increasingly frustrated with some of K.'s behaviors. She executed an agreement with her whereby K. agreed to sleep through the night with only one visit to the bathroom, not pout or have behavioral problems, and not abuse other patients. The consequence for noncompliance was that K. would not be allowed to go on outings.

¶4 On March 17, 2004, K. removed the alarms from her bedroom windows. Fearing she would leave, staff decided to move K. to an upstairs living room, where she could be supervised. K. refused and stated she was leaving the facility. Ms. Kraft was present with two other Haven Homes employees, Jim Cox and Linda Mullin. They had to forcibly carry K. upstairs. Jim Hazlett, another Haven Homes employee, was called to assist. K. eventually calmed down and stated she wanted to go home.

¶5 According to witnesses, Ms. Kraft was very angry and responded to K. by telling her that this is where she lives, she has nowhere else to go, and she cannot go home because her parents do not want her. Ms. Kraft was pointing her finger at K. while speaking loudly to her. K. was visibly hurt after Ms. Kraft made these statements. She reported the incident to Mare Cobb, a supervisor. While relating the facts, K. began to cry.

¶6 Ms. Kraft decided that K.'s bedroom should be moved upstairs because of the risk of her elopement. Ms. Kraft and Ms. Mullin brought K.'s belongings upstairs to the living room. Ms. Mullin began to place K.'s belongings in an upstairs bedroom, but Ms. Kraft told her not to do so, stating that K. must put away her belongings herself. These items included her bed, mattress, and dressers, which were too heavy for K. to move herself. Ms. Mullin later told Ms. Cobb about the incident.

¶7 Ms. Cobb reported the incident to Adult Protective Services (APS). In the incident report, Ms. Cobb quoted K., writing, "She [Ms. Kraft] said mean things to me. She hurt my feelings. Carrie said nobody wants me and my family doesn't want me or love me anymore. Carrie said I can't live anywhere else and I can't do anything because I ruin all the outings for everybody. Carrie said if I don't behave I can't do anything anymore. . . . I want to forget. I hope she won't say anymore mean things." Administrative Record (AR) at 441.

¶8 The referral was assigned to Lance Rickman, an APS investigator. After investigating the matter, he concluded that Ms. Kraft had mentally abused a vulnerable adult. DSHS notified Ms. Kraft of its finding. Haven Homes subsequently terminated Ms. Kraft's employment. She requested an administrative hearing.

¶9 At the hearing, Mr. Rickman testified that K. told him that Ms. Kraft was mean to her, called her a brat, and told her she behaved like a two-year-old. She reported that Ms. Kraft told her that nobody loved her, her family did not love her, and she ruined outings. Mr. Hazlett corroborated this evidence, testifying that "Carrie Kraft just told her [K.] that nobody really cared about her and nobody—her mom and dad didn't want to see her." Report of Proceedings (June 28, 2005) at 141.

¶10 Ms. Mullin testified that she saw Ms. Kraft angrily pointing a finger at K. and telling her that she could not go home, her parents did not want her, and she had nowhere else to go. She also heard Ms. Kraft tell K. that programs and outings for the residents were limited because K. ruined them. Ms. Mullin testified that K. was "visibly hurt" by Ms. Kraft's statements. *Id.* at 80. In a letter to a Haven Homes manager, Ms. Mullin wrote that "Miss Kraft would often make these hurtful statements to this particular client and this would cause the client to become extremely behavioral." AR at 243. Ms. Mullin was also troubled that Ms. Kraft told her not to help K. move her belongings, which included heavy items K. could not move herself. Ms.

Mullin noted that after Ms. Kraft left Haven Homes, K.'s behaviors improved.

¶11 Ms. Cobb testified that she talked to K. the day after the incident. K. was upset and started to cry when she related how Ms. Kraft told her that no one loved her, her family did not want her, and she ruins everything. Ms. Cobb also testified that she showed Ms. Kraft the allegations in the incident report. Apparently, Ms. Kraft did not deny the allegations and could not understand why they were considered abusive.

¶12 Ms. Kraft admitted that she had K. sign a contract limiting nighttime bathroom use. As to the March 17 incident, she explained that she was simply trying to orient K. to the reality that she could not go home. She admitted that she told K. that her family requested that she not live near them but denied telling K. that her parents did not love her, that nobody wanted her, or that outings were limited because of her.

¶13 In the initial order issued August 12, 2005, the administrative law judge (ALJ) concluded that Ms. Kraft mentally abused a vulnerable adult. Ms. Kraft appealed to DSHS's Board of Appeals (Board), arguing that the evidence was insufficient to support a finding of abuse due to "irregularities" in the investigation and inconsistent witness reports. *Id.* at 46. She also argued that the deprivation of her ability to earn a living in her chosen field based upon a "preponderance of the evidence" standard violated her due process rights. *Id.*

¶14 The Board upheld the ALJ's decision. It concluded that Ms. Kraft's actions of speaking harshly to K. while pointing a finger at her constituted mental abuse under RCW 74.34.020(2)(c). It also noted that the terms of the behavioral contract included consequences and punishments that, if invoked, excluded K. from her regular recreational activities and friends. It wrote, "The contract would have prohibited K. from doing acts that she had a right to do in her own home, such as visiting the bathroom more frequently than once per night." Clerk's Papers at 90.

However, the Board concluded that the contract in and of itself did not constitute mental abuse.

¶15 The Board rejected Ms. Kraft's argument relating to investigatory "irregularities," stating that Ms. Kraft had no right to have an APS investigation conducted in any particular way and that neither the ALJ nor the review judge has the authority to evaluate the APS investigator's interview techniques. Rather, they are simply directed to evaluate de novo whether Ms. Kraft emotionally abused K. It explained, "[I]f [DSHS] presents and relies upon poor factual information at the hearing, the consequence may be that [DSHS] is unable to meet its burden of proof and/or prevail." *Id.* at 92. Finally, it concluded that DSHS's burden of proof is a preponderance of the evidence, and that DSHS met that burden.

¶16 The superior court affirmed the Board's decision. Like the Board, it rejected Ms. Kraft's arguments pertaining to the burden of proof and the alleged investigatory irregularities. Ms. Kraft appeals.

## ANALYSIS

¶17 Ms. Kraft first contends that she was denied her constitutional right to due process when she was found to have abused a vulnerable adult at a hearing that applied a mere preponderance of the evidence standard of proof. Citing *Bang D. Nguyen v. Department of Health, Medical Quality Assurance Commission*, 144 Wn.2d 516, 29 P.3d 689 (2001) and *Ongom v. Department of Health, Office of Professional Standards*, 159 Wn.2d 132, 148 P.3d 1029 (2006), *cert. denied*, 550 U.S. 905 (2007), she asserts that "a decision to permanently deprive someone of the right to practice their chosen profession is quasi-criminal in nature and requires 'clear and convincing proof.' " Br. of Appellant at 10. She claims that as a result of the abuse finding, she will be unable to renew her teaching credential and she will be permanently barred from working with vulnerable adults.

¶18 "Constitutional challenges are questions of law subject to de novo review." *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006), *cert. denied*, 549 U.S. 1282 (2007). The appellate court reviews questions of law de novo by independently determining the applicable law and its meaning, and applying that law to the facts found by the administrative judge. *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 879-80, 154 P.3d 891 (2007). Statutes are presumed constitutional, and the burden to show otherwise is placed on the challenger. *Amunrud*, 158 Wn.2d at 215. This burden is a heavy one. The challenger must establish that the statute is unconstitutional " 'beyond question.' " *Id.* (quoting *Parrish v. W. Coast Hotel Co.*, 185 Wash. 581, 597, 55 P.2d 1083 (1936), *aff'd*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937)).

¶19 WAC 388-71-01255(1) provides that "[t]he ALJ shall decide if a preponderance of the evidence in the hearing record supports a determination that the alleged perpetrator committed an act of abandonment, abuse, financial exploitation or neglect of a vulnerable adult." Ms. Kraft disagrees with this standard of proof, contending the standard of proof in this case should be "clear and convincing." However, the cases she cites to support her argument are distinguishable.

¶20 Both *Nguyen* and *Ongom* involved professional license revocations. In *Nguyen*, the Washington Supreme Court found that a physician's professional license revocation proceeding under the Uniform Disciplinary Act, RCW 18.130.050(1), "instigated by the state and involving a stigma more substantial than mere loss of money" required clear and convincing proof. *Nguyen*, 144 Wn.2d at 529. In reaching this conclusion, the court compared medical delicensure to disbarment proceedings, which are characterized as "quasi-criminal" proceedings. *Id.* at 528-29. The court emphasized that the "unique nature" of these proceedings requires the higher due process protection of quasi-criminal proceedings—clear and convincing proof. *Id.* at 529.

¶21 Following *Nguyen*, the court applied the clear and convincing standard of proof in a disciplinary proceeding involving revocation of a nursing assistant's license. *Ongom*, 159 Wn.2d at 136. Because the case involved the revocation of a professional license, the court found that *Nguyen* controlled, concluding that "[t]he minimum constitutional standard of proof in a professional disciplinary hearing is clear and convincing evidence." *Id.* at 142.

¶22 In contrast to *Nguyen* and *Ongom*, Ms. Kraft did not hold a license to work with vulnerable adults. She was not facing a disciplinary proceeding that would result in the revocation of a license. Rather, she was facing an administrative determination as a lay person that she mentally abused a vulnerable adult under chapter 74.34 RCW. Ms. Kraft claims that her teaching certificate is at risk and therefore she is entitled to a higher burden of proof. However, nothing in the record establishes that this finding will cause her to lose her certification. Unlike the petitioners in *Nguyen* and *Ongom*, Ms. Kraft was not working in a position tied to a professional certificate. Under these circumstances, there is no reason to apply a higher standard of proof when reviewing a substantiated finding of mental abuse. The proper standard of proof involving abuse of a vulnerable adult under chapter 74.34 RCW is a preponderance of the evidence.

¶23 Next, Ms. Kraft asserts that insufficient evidence supports DSHS's finding of mental abuse under chapter 74.34 RCW. She claims numerous "irregularities" in the investigation and inconsistent witness reports undermine the agency's finding. Her criticisms of the investigator include his alleged use of leading questions, his interviewing witnesses together, his failure to understand the timing or context of the March 17 incident, and his failure to ensure witness accuracy and credibility.

¶24 Our review is governed by the Administrative Procedure Act (APA). RCW 34.05.570. We stand in the same position as the superior court and review the agency's decision by applying APA standards directly to the agency

record. *Donahue v. Cent. Wash. Univ.*, 140 Wn. App. 17, 23, 163 P.3d 801 (2007). "We will uphold a board's factual findings if supported by substantial evidence." *Id.* Factual findings made by the ALJ are sustained if they are supported by evidence that is substantial in light of the whole record. *Eidson v. Dep't of Licensing*, 108 Wn. App. 712, 723, 32 P.3d 1039 (2001).

¶25 The Washington Legislature has determined that vulnerable adults may be in particular need of protection from abuse, neglect, abandonment, or exploitation. RCW 74.34.005; *Schumacher v. Williams*, 107 Wn. App. 793, 28 P.3d 792 (2001). DSHS is responsible for investigating allegations of abuse against a vulnerable adult. RCW 74-.34.005. RCW 74.34.020(2) defines "abuse" as "the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult." "Mental abuse" includes "coercion, harassment, inappropriately isolating a vulnerable adult from family, friends, or regular activity, and verbal assault that includes ridiculing, intimidating, yelling, or swearing." RCW 74.34.020(2)(c).

¶26 Ms. Kraft fails to cite any authority supporting her claim that APS must conduct its investigation in any specific way or indicating how these alleged problems undermine any particular finding of fact. Her failure to do so precludes review of the issue. RAP 10.3(a); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Furthermore, most of the alleged irregularities cited by Ms. Kraft challenge the weight or credibility of the evidence—considerations within the exclusive province of the trier of fact. We do not evaluate witness credibility or reweigh the evidence. *Affordable Cabs, Inc. v. Employment Sec. Dep't*, 124 Wn. App. 361, 367, 101 P.3d 440 (2004).

¶27 More importantly, Ms. Kraft fails to assign error to the Board's numerous findings. Where an agency's findings of fact are unchallenged, they are verities on appeal. *Donahue*, 140 Wn. App. at 23. These unchallenged findings amply support a finding that Ms. Kraft mentally

abused a vulnerable adult. DSHS found that K. was focused on returning home to her parents; Ms. Kraft angrily told K. that she could not go home because her parents did not want her; Ms. Kraft was pointing her finger at K. and speaking loudly when she made these statements; K. was visibly hurt by these statements; K. reported that Ms. Kraft told her no one loved her and that she ruined outings; and Ms. Kraft executed an agreement with K. whereby K. was allowed to get up only once during the night to use the bathroom. These findings substantially support DSHS's conclusion that Ms. Kraft mentally abused a vulnerable adult under RCW 74.34.020(2)(c). Accordingly, we affirm.

KULIK and KORSMO, JJ., concur.

Review denied at 165 Wn.2d 1018 (2009).