[No. 42070-8-II.   Division Two.   July 17, 2012.]

THOMAS GOLDSMITH III, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

574

*Don W. Taylor* (of *Owens Davies Fristoe Taylor & Schultz PS*), for appellant.

*Robert M. McKenna, Attorney General,* and *Stephen S. Manning, Assistant,* for respondent.

¶1 ARMSTRONG, J. — Thomas Goldsmith III appeals the conclusion of the Department of Social and Health Services (Department) Board of Appeals (Board), as affirmed by the superior court, that he mentally abused his father, a vulnerable adult. Goldsmith argues that the Department lost jurisdiction over this action after his father died and that the Board erred in affirming the Department's abuse finding. Because the Department did not lose jurisdiction when Goldsmith's father died, and the Department's mental abuse finding is supported by the law and facts, we affirm.

## FACTS

¶2 In April 2008, Thomas Goldsmith Sr. (hereafter Thomas Sr.) was 98 years old and suffered from several physical

ailments, including a heart condition. He and his wife, Helen, who had suffered a recent steep decline in cognitive ability, required 24-hour home care. Thomas Sr. enjoyed a distinguished career as an electrical engineer. As late as November 2008, he was intellectually active with others and characterized as "very sharp." Administrative Record (AR) at 18. By January 2009, however, Thomas Sr. suffered mild cognitive impairment and wanted a guardian. The superior court established a full guardianship over his estate.

¶3 Thomas Sr. and his wife have three grown children: Goldsmith, his brother, and a sister. Goldsmith's sister-in-law managed his parents' investment portfolio until her untimely death. In 2003, Thomas Sr. asked Goldsmith to help manage their considerable estate and he agreed to do so. Goldsmith charged his parents $25 per hour plus expenses for the several trips he made from his home in Boston to Washington each year. Thomas Sr. paid these fees through Capital Guardianship Services (CGS). In March 2006, Thomas Sr. executed a durable power of attorney naming Leesa Camerota, executive director of CGS, as his attorney-in-fact, and granting her power over his assets and liabilities. Thomas Sr. designated Goldsmith as successor attorney-in-fact.

¶4 Goldsmith had significant disagreements with CGS over the handling of his parents' finances. He believed that CGS was overpaying for caregiver services and should have been liquidating real property so that his parents would have adequate funds to maintain their lifestyle.

¶5 As a result, Goldsmith and his father had heated discussions about finances in person and by phone that deteriorated into yelling. According to one caregiver, these fights caused Thomas Sr. to cry, refuse to take his medication, and otherwise become noncompliant with caregiver instructions. The stress would become so great that the caregivers themselves felt threatened.

¶6 Goldsmith's constant financial pressure on his father led Camerota and the assistant director of CGS, Janet Franklin, to file a declaration in October 2008 in support of a vulnerable adult protective order. Their declaration described Thomas Sr. as becoming visibly shaken when Goldsmith would not honor his request to stop arguing about financial matters. They further described Goldsmith's actions as intolerable and abusive and stated that his relentless pressuring affected his parents' eating. The resulting protective order eventually led to an agreed visitation order limiting Goldsmith's visits to four hours per week and ordering him to refrain from discussing finances with his parents.

¶7 In the meantime, on October 30, 2008, the Department's Adult Protective Services program received an allegation that Goldsmith was mentally abusing his father. After an investigation, the Department issued a substantiated finding of mental abuse of a vulnerable adult and notified Goldsmith. He requested an administrative hearing at which two of Thomas Sr.'s caregivers testified, as did Camerota, Franklin, department social worker Jacqueline Heinselman, and Goldsmith. Thomas Sr. died on March 5, 2009, a few months before the June 2009 hearing.

¶8 Heinselman testified about investigating the abuse allegation and interviewing Thomas Sr. The protective order was in effect by then, and Thomas Sr. told her that he did not want further orders but wanted Goldsmith's visits to be shorter. Despite his earlier complaints about Goldsmith, as set forth in the CGS declaration, Thomas Sr. told Heinselman he had no problems with his son. Heinselman opined that it was common for people in abusive relationships to recant, and she believed that Thomas Sr. was "covering up." Report of Proceedings (RP) at 66, 80. As a result of her investigation, Heinselman concluded that Goldsmith had yelled at and harassed his father to the point where Thomas Sr. was visibly shaken and upset and that Goldsmith should have known his conduct was harmful.

¶9 Franklin testified that she witnessed heated exchanges between Goldsmith and his father about finances and that after Goldsmith stated once that his life depended on his parents' money, Thomas Sr. put his head down on the table and said he could not go on like this. When Thomas Sr. informed CGS that he feared he was facing bankruptcy, Franklin and Camerota assured him he was not. Franklin testified that all five caregivers reported yelling between Goldsmith and his father.

¶10 According to Franklin, Goldsmith would visit his parents for a week or two and then return four to eight weeks later. Caregiver Beata Bryl testified that Goldsmith would have day-long visits with his parents that included verbal fights about their finances. Thomas Sr. would be very upset after his son left. On one occasion, a "very angry" Thomas Sr. told Goldsmith to leave or he would call the police. RP at 135. When Goldsmith stayed and continued to argue, Bryl persuaded him to leave, after which Thomas Sr. was "really upset." RP at 135. Thomas Sr. would display anger and anxiety only after arguing with Goldsmith; he was otherwise calm. Bryl added that after the protective order was in place, Thomas Sr. was heartbroken but remained very specific about the need for limited visitation with his son.

¶11 Ava League, a nursing assistant who also cared for Thomas Sr. and his wife, testified that Goldsmith would visit his parents four to five times a year, at a minimum, and that Thomas Sr. stopped wanting him to come. Thomas Sr. and his son would argue "a lot," sometimes for up to two hours, and Thomas Sr. would cry and become noncompliant afterward.

¶12 Camerota testified that she completed the declaration in support of the vulnerable adult protective order because Thomas Sr.'s well-being was in danger due to the stress and tension concerning his legal and financial issues. She overheard a heated conversation between Thomas Sr. and Goldsmith, during which Thomas Sr. slammed the

table. She also saw Thomas Sr. become withdrawn and acquiescent to Goldsmith's demands. After Camerota e-mailed Goldsmith at Thomas Sr.'s request and asked him not to visit because of the stress he created, Goldsmith spoke with his father and came out to visit.

¶13 Goldsmith acknowledged that he and his father did not have the "best discussions" about finances and that Thomas Sr. once told him to keep his voice down. RP at 190. Goldsmith found the lack of results following these discussions very frustrating. He denied yelling at his father in the way his father yelled at him. He did admit to yelling at his father, however, and he also admitted that Bryl had asked him to leave and that his father had asked him not to come out.

¶14 The administrative law judge concluded that by continually bombarding his father with predictions of financial doom, Goldsmith harassed and verbally assaulted a vulnerable adult:

> Mr. Goldsmith's stridency and perseverance over hours, days, weeks, and months elevated his genuine concern for Thomas, Sr.'s estate plan to the level of harassment. As part of the harassment, Mr. Goldsmith repeatedly yelled at Thomas, Sr. As manifested in Thomas, Sr.'s tone of voice, body language, and behavior, Mr. Goldsmith's pattern of harassment induced anger, frustration, resignation, depressed mood, and self-neglect in Thomas, Sr.

AR at 92-93. The administrative law judge affirmed the Department's finding that Goldsmith mentally abused a vulnerable adult.

¶15 The Board affirmed the administrative law judge, entering findings of fact and conclusions of law in support of its conclusion that because Goldsmith willfully yelled at and harassed his father and thereby injured him, Goldsmith mentally abused a vulnerable adult.

¶16 Goldsmith sought judicial review in superior court, and the court denied his petition for review and his motion to vacate the Board's review decision and order.

## ANALYSIS

### I. JURISDICTION AFTER DEATH OF VULNERABLE ADULT

¶17 Goldsmith argues that the Department lost jurisdiction of this action when his father died in March 2009. He contends that the subject matter of the case was his father's protection and that when his father died, the action ceased to exist.

¶18 Jurisdiction is the power to hear and determine a cause or proceeding. *State v. Golden*, 112 Wn. App. 68, 72, 47 P.3d 587 (2002). Jurisdictional challenges are questions of law that we review de novo. *Golden*, 112 Wn. App. at 72. A tribunal's lack of subject matter jurisdiction may be raised at any time in a legal proceeding. *Inland Foundry Co. v. Spokane County Air Pollution Control Auth.*, 98 Wn. App. 121, 123, 989 P.2d 102 (1999). Without subject matter jurisdiction, a court or administrative tribunal can do nothing other than dismiss the action. *Inland Foundry Co.*, 98 Wn. App. at 123-24.

¶19 Goldsmith's argument is based largely on RCW 74.34.210 and the cause of action RCW 74.34.200 creates. When the legislature adopted the abuse of vulnerable adults act, chapter 74.34 RCW, it created a new cause of action to protect vulnerable adults from abandonment, abuse, financial exploitation, or neglect. *Schumacher v. Williams*, 107 Wn. App. 793, 798, 28 P.3d 792 (2001) (citing RCW 74.34.200); 16 DAVID DEWOLF & KELLER ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 1.22, at 34-35 (3d ed. Supp. 2011-12). More specifically, RCW 74.34.200(1) provides:

> In addition to other remedies available under the law, a vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency,

or an individual provider, shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby.

*See* RCW 74.34.110 (creating action for protection order in cases of abandonment, abuse, financial exploitation, or neglect of vulnerable adult).

¶20 As RCW 74.34.210 explains, a damages claim survives the vulnerable adult's death:

A petition for an order for protection may be brought by the vulnerable adult, the vulnerable adult's guardian or legal fiduciary, the department, or any interested person as defined in RCW 74.34.020. An action for damages under this chapter may be brought by the vulnerable adult, or where necessary, by his or her family members and/or guardian or legal fiduciary. The death of the vulnerable adult shall not deprive the court of jurisdiction over a petition or claim brought under this chapter. Upon petition, after the death of the vulnerable adult, the right to initiate or maintain the action shall be transferred to the executor or administrator of the deceased, for recovery of all damages for the benefit of the deceased person's beneficiaries set forth in chapter 4.20 RCW or if there are no beneficiaries, then for recovery of all economic losses sustained by the deceased person's estate.

¶21 Goldsmith argues that once an action is brought on behalf of a vulnerable adult, RCW 74.34.210 transfers a damages claim to a personal representative after the vulnerable adult's death, but any remaining claims cease to exist. *See In re Pers. Restraint of Acron*, 122 Wn. App. 886, 890, 95 P.3d 1272 (2004) (where statute specifically designates things upon which it operates, there is an inference that the legislature intended all omissions). In other words, Goldsmith argues that a claim for damages is the only action that survives the death of a vulnerable adult under the abuse of vulnerable adults act. The Department responds that this argument ignores other provisions of the act and that RCW 74.34.200 and .210 are irrelevant to these proceedings.

¶22 In this action, the Department is not seeking a protective order or damages, which are the actions at issue in RCW 74.34.210. Rather, this case concerns an investigation authorized by other provisions of chapter 74.34 RCW. The act requires the Department to receive reports of abuse concerning vulnerable adults from "mandated reporters," who include homecare agency employees. RCW 74.34.005(5); former RCW 74.34.020(10) (2007). Such reporters must report cases of abuse concerning vulnerable adults to the Department when there is reasonable cause to do so. RCW 74.34.035(1). A "vulnerable adult" includes a person over age 60 with the functional, mental, or physical inability to care for himself. Former RCW 74.34.020(15)(a). The Department must investigate reports of abuse and notify the alleged perpetrator of the investigation's outcome. RCW 74.34.067, .068(1). The alleged perpetrator may then challenge a finding of abuse by seeking an administrative hearing, as Goldsmith did here. WAC 388-71-01235, -01240. Either the Department or the alleged perpetrator may appeal the administrative law judge's ruling; the Board's decision is the Department's final decision. RCW 34.05.464(4); WAC 388-71-01275(3).

¶23 The Department must place identifying information concerning individuals with substantiated findings of abuse on a state registry. Former RCW 74.39A.050(9) (1999), *recodified as* RCW 74.39A.056(3); WAC 388-71-01280. The Department must use this registry to determine whether to grant licenses to residential long-term facilities or allow a person to work in a position having unsupervised access to vulnerable adults. Former RCW 74.39A.050(8) (1997), *recodified as* RCW 74.39A.056(2); WAC 388-76-10120(3), -10180(1); *see also* RCW 74.34.063(5) (Department shall notify proper licensing authority concerning report of abuse by anyone professionally licensed, certified, or registered under Title 18 RCW). The Department of Health may use information from the Department concerning abuse findings in deciding whether to deny, suspend, modify, or revoke a residential treatment facility license. WAC 246-337-035(1).

In addition, the Department must report potential criminal conduct concerning a vulnerable adult to law enforcement authorities. RCW 74.34.063(2). As the Department asserts, the legislature has identified several purposes for its findings in order to protect the vulnerable adult victim and other vulnerable adults. *See* RCW 74.34.005.

¶24 The vulnerable adult victim is not a party to these proceedings, and his death does not deprive either the Department or the courts of jurisdiction to consider an abuse investigation's outcome. Even if, as Goldsmith asserts, there is no risk that he will commit abuse in the future, the Department has jurisdiction over the proceedings resulting from its investigation into the abuse of Thomas Sr.

## II. Review of Board's Decision

¶25 Under the Administrative Procedure Act, Goldsmith must demonstrate the invalidity of the Board's final order. RCW 34.05.570(1)(a); *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 381, 932 P.2d 139 (1997). Goldsmith argues that the final order is invalid because (1) it was outside the Department's authority, (2) the Department engaged in unlawful procedure or decision making, (3) the Department erroneously interpreted or applied the law, (4) substantial evidence does not support the final order, and (5) the final order is arbitrary and capricious. *See* RCW 34.05.570(3)(b)-(e), (i). Because Goldsmith does not explain how the Department exceeded its authority or engaged in unlawful procedure or decision making, or why its final order was arbitrary and capricious, we do not address these claims of error. RAP 10.3(a)(6); *State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990). Goldsmith also assigns error to several of the findings of fact in the final order without supporting his claims of error with argument. Conse-

quently, he has waived these challenges as well. *In re Estate of Lint*, 135 Wn.2d 518, 532, 957 P.2d 755 (1998).

■■ ¶26 When reviewing an agency decision, we apply the standards of chapter 34.05 RCW directly to the agency's record without regard to the superior court decision. *Burnham v. Dep't of Soc. & Health Servs.*, 115 Wn. App. 435, 438, 63 P.3d 816 (2003). Although we review legal issues de novo, we give substantial weight to the agency's interpretation of the law it administers, particularly where the issue falls within the agency's expertise. *In re Disciplinary Proceeding Against Brown*, 94 Wn. App. 7, 12, 972 P.2d 101 (1999). We will sustain findings of fact if substantial evidence supports them, i.e., evidence sufficient to persuade a fair-minded person the finding is true. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). We do not weigh witness credibility or substitute our judgment for the agency's findings of fact. *Brown v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 177, 182, 185 P.3d 1210 (2008).

■ ¶27 Goldsmith does not challenge the Board's conclusion that his father was a vulnerable adult, but he does dispute its conclusion that he mentally abused his father. The Department must prove vulnerable adult abuse under chapter 74.34 RCW by a preponderance of the evidence. *Kraft v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 708, 716, 187 P.3d 798 (2008). This standard means it is more likely than not the alleged conduct occurred. WAC 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. RCW 74.34.020(2) defines "abuse" as "the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult" and includes mental abuse. "Willful" is defined as "the nonaccidental action or inaction by an alleged perpetrator that he/she knew or reasonably should have known could

cause harm, injury or a negative outcome."[1] WAC 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. "Mental abuse" encompasses "harassment . . . and verbal assault that includes ridiculing, intimidating, yelling, or swearing." RCW 74.34.020(2)(c).

¶28 Goldsmith argues that the Department failed to prove he acted willfully or inflicted injury; the Department responds that there is substantial evidence of both willfulness and injury. Goldsmith admitted that he and his father did not have the best discussions and that he yelled at Thomas Sr. As the Board concluded, Goldsmith's yelling at his father was deliberate and not accidental. There was ample testimony that Thomas Sr., who was ordinarily calm, would become angry and upset after these exchanges. These angry exchanges occurred regularly, and Goldsmith knew or should have known that they caused his father considerable stress. A reasonable person would know that lengthy and repeated yelling matches with a 98-year-old in declining health amounted to mental abuse that could cause harm or injury. RCW 74.34.020(2)(c); WAC 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. We agree with the Board that Goldsmith's conduct was willful.

¶29 Contrary to Goldsmith's argument, the Department was not required to prove injury by expert medical testimony. Administrative hearings proceed under relaxed rules of evidence. *Ingram v. Dep't of Licensing*, 162 Wn.2d 514, 524, 173 P.3d 259 (2007). In an administrative hearing, evidence is admissible if it is the kind of evidence on which reasonably prudent persons are accustomed to rely in conducting their affairs. RCW 34.05.452(1). In *Kraft*, caregivers testified about the adverse effects of a fellow employee's actions and statements on the vulnerable adult victim. *Kraft*, 145 Wn. App. at 712-13. Similarly, Thomas Sr.'s caregivers testified about the effects of Goldsmith's arguments on his father. And their opinions of the harm the arguments caused were rationally based on their percep-

---

[1] We question the reference to "negative outcome" as overly broad. Because this language is not necessary to our holding here, however, we do not address it further.

tions. *See* ER 701. This testimony was more than sufficient to prove willful action that inflicted injury, as the Board concluded:

[I]t cannot be ignored, that Thomas, Sr. indicated to the investigator a wish that his visits with his son were shortened and exhibited a reluctance to answer specific questions regarding the reason for this wish. This evidence, combined with the unequivocal testimony of the caregivers and CGS employees regarding Thomas, Sr.'s notable and contemporaneous negative reactions he exhibited in response to the verbal altercations with his son, do prove by a preponderance of the evidence that [Goldsmith's] persistent and intense arguments with his father inflicted, at the very least, mental anguish and a negative outcome on Thomas, Sr. and were, therefore, verbal assaults. Because the evidence supports the finding that [Goldsmith's] persistent and repetitive verbal engagements regarding financial matters were unwelcomed by Thomas, Sr., those actions constituted harassment as well as verbal assault.

AR at 31; *see also Kraft*, 145 Wn. App. at 718 (observations that caregiver's statements "visibly hurt" vulnerable adult victim supported finding of mental abuse).

[11] ¶30 Goldsmith attempts to justify his actions by asserting that he had an obligation as his father's financial advisor to warn him about the precarious state of his finances. The Department responds that there is no evidence that Goldsmith was his father's financial advisor, but any such status is beside the point. As the Board concluded, "The subject or subjects being addressed during the verbal assault do not provide a defense to the proscribed behavior." AR at 32. The Board correctly observed that the evidence about Thomas Sr.'s finances is irrelevant in addressing whether Goldsmith yelled at and harassed his father and, in doing so, caused injury. If the harm results from improper action, the action is abusive. *Brown*, 145 Wn. App. at 183 (citing *R.J.M. v. State*, 946 P.2d 855, 863 n.9 (Alaska 1997)). Regardless of his motives, Goldsmith's conduct was improper, and the Board did not err in concluding it constituted mental abuse.

¶31 We affirm the Board's conclusion that Goldsmith mentally abused his father, a vulnerable adult.

JOHANSON, A.C.J., and PENOYAR, J., concur.