**FILED**
**APRIL 30, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SARAH EVERT AND STEPHEN EVERT, | ) ) ) | No. 32455-9-III |
| Appellants, | ) ) ) | |
| vs. | ) ) | UNPUBLISHED OPINION |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Adult Protective Services, | ) ) ) ) | |
| Respondent. | ) ) | |

FEARING, J. — Sarah and Stephen Evert, wife and husband, appeal from a superior court ruling that upheld an Adult Protection Services' order finding that the Everts mentally abused a vulnerable adult. The Everts isolated the adult, Thomasene, from her family. Thomasene is the mother of Sarah Evert. Because substantial evidence and unchallenged findings of fact support the superior court ruling, we affirm.

## FACTS

Sarah and Stephen Evert do not assign error to the Department of Social and Health Services (DSHS) Board of Appeals' (Board) findings of fact in the Board's review decision and final order, dated October 24, 2013. We thus consider those findings

verities on appeal. *See* RAP 10.3(h); *Fuller v. Dep't Emp't Sec.*, 52 Wn. App. 603, 606, 762 P.2d 367 (1988). Some of our factual statement comes from the findings of fact.

In 2011, Thomasene lived with her husband Glenn near Boise, Idaho. Thomasene and Glenn were respectively 83 years old and 86 years old, had been married 64 years, and had five adult children: Dale McCleary, Thomasene (Sene) Blevins, Phyllis Keith, Glenna Kimball, and Sarah Evert. We do not use Thomasene's and Glenn's surname.

Both Glenn and Thomasene suffered poor health. Thomasene's mental impairments included dementia and depression. She had short term memory deficits and needed cuing for her memory. Her level of cognition varied, and she easily grew upset. Sometimes she did not remember events which occurred the same day, or within hours. She forgot events that occurred weeks earlier. Thomasene's long term memory remained intact.

Thomasene physically suffered from osteoporosis and osteoarthritis. She underwent total shoulder and knee replacements. By late 2011, Thomasene needed supervision for safety and assistance with her activities of daily living. By late 2011, Glenn also suffered from dementia and physical challenges.

By December 2011, all of Thomasene and Glenn's children agreed that Glenn could not adequately care for Thomasene. Sarah Evert proposed that her mother live in the Everts' adult family home in Spokane. Sarah, an occupational therapist with

experience in providing home care, would charge Thomasene $3,500 per month to care for her at the home. The family did not accept Sarah Evert's proposal.

In January 2012, Phyllis Keith arranged for her parents to live in an assisted living facility near Boise. Keith lived near the facility and helped her parents with daily needs. Glenn moved back to the couple's home in March 2012. Keith continued to care for Glenn in his home. Thomasene stayed in the Boise assisted living facility, but her mental state worsened. Sarah and Stephen Evert suggested that Thomasene and Glenn divorce, so Thomasene could receive half of the marital estate to use to pay Sarah and Stephen for her care without Glenn's interference.

By March 2012, Thomasene could not recall events from the previous day. She cried. She was heavily medicated. Thomasene needed supervision and assistance with activities of daily living.

On March 15, 2012, Sarah and Stephen Evert traveled to Boise and brought Thomasene to their adult family home in Spokane without notifying Sarah's siblings. The Everts convinced Thomasene to file for divorce from Glenn and assisted her in filing before leaving Boise for Spokane. Sarah's siblings expressed concern at Thomasene's filing for divorce. Sarah responded with an e-mail:

> Any of you may call her [Thomasene] any time you want. However, if you are going to badger her about dad and upset her, there is no point in that and I won't let you do that.

Admin. Record (AR) at 4.

3

While a resident at Sarah and Stephen Evert's adult family home, Thomasene participated in activities with Sarah and her daughter, as well as with others. Caregivers provided excellent physical care and assistance. She expressed to others that she enjoyed living at the home. She gained friends among the residents of the adult family home.

Sarah and Stephen Evert instructed their adult family home caregivers not to allow Sarah's siblings or Glenn to speak with Thomasene unless the Everts were present. The Everts instructed their staff not to answer telephone calls from Idaho phone numbers. On those occasions when other children or Glenn telephoned Thomasene, Stephen and Sarah Evert closely monitored the communications. Dale McCleary and Sene Blevins avoided talking to Thomasene about subjects not approved by Sarah and Stephen Evert so that the Everts would not block communication with the mother. Sarah reprimanded Blevins if she mentioned Glenn while speaking to Thomasene. Both McCleary and Blevins had engaged in frequent communication with their mother before her move to Spokane.

The Everts restricted Phyllis Keith's phone contact with her mother, such that she only spoke with Thomasene four times between March 2012 and September 2012. Sarah cautioned Keith about those subjects on which he should not speak with Thomasene. During one call, Thomasene asked Keith about Glenn. When Keith began to answer, Stephen Evert ended the call.

Phyllis Keith called Thomasene on Glenn's behalf in May 2012. Stephen Evert told Keith that he was recording the call, and Keith carefully selected topics about which

4

to speak. When Thomasene asked Keith about Glenn, Keith put Glenn on the telephone. Glenn said: "Hello, Honey, how are you, when are you coming home?" AR at 6. Stephen Evert abruptly terminated the call. Evert then called Keith and profanely reprimanded her for allowing Glenn to talk to Thomasene.

In September 2012, Stephen Evert interrupted another telephone conversation between Phyllis Keith and Thomasene, during which call he told Thomasene that Keith took her money. When Thomasene asked him to stop talking, he continued until Keith finally ended the call.

The Everts also monitored and restricted Thomasene's contact with Glenna Kimball, who lived in California. Kimball had spoken to her mother about once a week before Thomasene moved to Spokane. When Kimball called Thomasene at the Everts, Stephen Evert often expressed belligerence. He called Kimball "an asshole," and told Kimball "Fuck you." AR at 7. While monitoring calls between Kimball and Thomasene, he informed Thomasene that Kimball lied to her. If Glenna Kimball asked her mother how she was or if she knew what was happening, the Everts accused Kimball of upsetting Thomasene and terminated the call. Kimball never heard Thomasene get upset at her during a conversation.

The Idaho district court, in which Thomasene filed for divorce, appointed Frances Stern as Thomasene's guardian ad litem (GAL) to determine whether Thomasene possessed sufficient mental capacity to bring the action. An Idaho court also appointed

5

Stern as GAL for Thomasene and Glenn in a guardianship action brought by Glenna Kimball. Stern traveled to Spokane and interviewed Thomasene. Stern found Thomasene charming, but with "significant, gaping holes in her understanding." AR at 129. Stern interviewed all of Thomasene's children and some of Thomasene's care providers in Idaho and Spokane. Stern reviewed Thomasene's medical records. Sarah Evert admitted to Stern that she did not allow her father or some of her siblings to speak to Thomasene in order to protect the best interest of her mother.

In 2012, the State of Washington Department of Social and Health Services Adult Protective Services (APS) received allegations that Stephen and Sarah Evert mentally abused Sarah's mother, Thomasene, a vulnerable adult. On June 5, 2012, Glenn filed a complaint with APS, alleging that Sarah Evert kidnapped his wife and sought to take financial advantage of the situation.

APS Investigator Ellen Rapkoch assumed control of Glenn's allegations against Sarah Evert. As part of her investigation, Rapkoch interviewed Sarah and Stephen Evert, Glenn, Glenna Kimball, Phyllis Keith, Patty Bowers, and Helen Wynn. Bowers and Wynn were social workers assigned to Thomasene's adult family home.

Ellen Rapkoch interviewed Thomasene on June 18, 2012. Rapkoch found that Thomasene did not comprehend the circumstances under which she moved from Boise to Spokane other than her husband, Glenn, did not wish to join her. Thomasene told Rapkoch she was upset about the move. Thomasene characterized Glenn as rude and

6

explained she needed a divorce to obtain money from Glenn. Thomasene stated that she enjoyed living with her daughter, Sarah Evert. She did not recall Stephen Evert's name. Thomasene told Rapkoch that she missed her other children and that Sarah would not let her talk to Glenn.

In her interview with Ellen Rapkoch, Sarah Evert admitted to restricting Thomasene's telephone contact with Glenn, Glenna Kimball, and Phyllis Keith. Sarah insisted the restrictions were needed because the three resisted the divorce. Sarah also told Rapkoch that Glenna "badgered" Thomasene. AR at 10.

GAL Frances Stern filed a report with the Idaho court, on July 10, 2012. In the report, Stern recommended suspending the divorce proceeding as she found Thomasene neither understood the action, nor had the capacity to understand. On August 17, 2012, the Ada County district court in Idaho approved Glenna Kimball's petition for appointment as Glenn and Thomasene's temporary guardian. The order additionally named Kimball, Phyllis Keith, and Dale McCleary as temporary co-conservators of Thomasene and Glenn's estate. Ellen Rapkoch reviewed Stern's GAL report as part of her investigation into the allegations against Sarah and Stephen Evert.

On August 27, 2012, Sene Blevins and Glenna Kimball visited their mother at the Everts' adult family home. A caregiver allowed them to enter and speak with their mother. Glenna told Thomasene about the difficulties she and Thomasene's other children encountered in calling her. Thomasene commented that she wondered why no

one ever called. When Glenna told Thomasene that Stephen Evert accused Glenn of

sexually abusing her, she said, "Well, where did he get that!" AR at 9. Stephen Evert

appeared and demanded that Blevins and Kimball leave. Thomasene asked why, and

Kimball said she had a right to visit her mother. Blevins echoed Kimball's statement.

Thomasene asked to leave the Evert home with her daughters, but Stephen Evert told her

she could not leave because she was a ward of the State of Washington. Evert insisted

that his two sisters-in-law leave or he would call the police. Thomasene became upset

and insisted: "They don't have to leave!" AR at 10. To avoid conflict, Kimball and

Blevins left the home. Stephen Evert shouted profanities at them.

On September 14, 2012, Glenn called APS again about Sarah and Stephen's care

for Thomasene. APS officially added Stephen Evert as the subject of the investigation.

On September 26, 2012, APS ended its investigation and found by a

preponderance of the evidence that Sarah and Stephen Evert committed mental abuse of a

vulnerable adult under RCW 74.34.020(2)(c). APS removed Thomasene from Sarah and

Stephen's care. In a letter ruling, APS explained the basis for its finding:

> In March 2012, you [Sarah and Stephen Evert] moved [Thomasene]
> from Boise where she was residing in an Assisted Living Facility to
> Spokane, without prior notification to her husband of over 45 years and
> other concerned family members, to live in an Adult Family Home (AFH)
> operated by you and your spouse. [Thomasene], diagnosed with dementia,
> did not have the cognitive ability to understand why she was moved from
> Boise. On several occasions [Thomasene] was not provided with the
> opportunity to talk with her husband and other family members on the
> telephone and when she was, there were occasions when you monitored and

8

controlled her conversations by listening in, interrupting and choosing when the conversation should be terminated. You admitted to intentionally blocking [Thomasene's] husband's phone number. You denied [Thomasene] opportunities to talk with her husband and other family members on the telephone and restricted [Thomasene's] visitation with family members, isolating [Thomasene] from her husband and family.

AR at 79.

## PROCEDURE

Sarah and Stephen Evert requested a hearing before an Office of Administrative Hearings administrative law judge (ALJ) to review APS' order. After conducting a three-day hearing, ALJ Debra H. Pierce affirmed APS' determination, concluding:

11. The Department has established, by a preponderance of the evidence, that the Appellants, Stephen Evert and Sarah Evert inflicted mental abuse on Thomasene by inappropriately isolating her from some family members who disagreed with their plan of action to care for Thomasene, so that their plans and decisions regarding Thomasene's care would not be interrupted.

12. Although the undersigned understands that Appellants did not engage in this conduct with the "intent" of abusing Thomasene, Appellants' intent is irrelevant. An APS administrative hearing and appeal is neither a criminal nor a civil tort proceeding to determine "guilt" or "civil culpability." It is a process for determining who should or should not have unsupervised contact and care over a vulnerable adult under circumstances licensed by or otherwise involving the Department through financial support. An APS registry listing is not intended as a punitive measure or some other form of personal judgment, but rather a process established solely for the protection of vulnerable adults. The questions before this tribunal are 1) whether or not Appellant engaged in the conduct or omissions alleged, and if so 2) whether the alleged conduct or omissions meets the statutory definition of abuse. Since the Appellant's conduct and omissions meet the statutory definition of abuse, the Department's finding must be affirmed.

9

AR at 44.

Sarah and Stephen Evert filed a petition for review of the ALJ's decision with the DSHS Board of Appeals. The Board of Appeals affirmed APS' order and determination that the Everts mentally abused Thomasene by inappropriately isolating her. The Board concluded:

> 11. The ALJ resolved any alleged conflicts in testimony with the determination that the testimony of Mr. McCleary, Ms. Blevins, Ms. Keith, and Ms. Kimball were not only consistent, but more credible where it conflicted with the testimony of the Appellants. The Appellants are simply trying to assign error because they disagree with the ALJ's determinations, not because actual errors exist.
> 12. The Department met its burden of proof to show that the Appellants mentally abused Thomasene.

AR at 16.

Sarah and Stephen Evert filed a petition for review of the DSHS Board of Appeals' decision in Spokane County Superior Court. Before the trial court, the Everts contended: (1) the APS investigator did not conduct a full and fair investigation under chapter RCW 74.34, and (2) neither Sarah nor Stephen mentally abused or inappropriately isolated Thomasene while she was in their care. The superior court affirmed the DSHS Board of Appeals. The trial court ruled that APS' investigation met the requirements of chapter 74.34 RCW, and substantial evidence supported APS' determination that the Everts mentally abused Thomasene by isolating her from family members.

LAW AND ANALYSIS

On appeal, Sarah and Stephen Evert repeat the two arguments asserted before the superior court. We repeat the ruling of the superior court.

APS Investigation

In 1999, the Washington legislature adopted the Abuse of Vulnerable Adults Act, chapter 74.34 RCW. The act requires DSHS, through its Adult Protective Services Division, to receive reports of abuse of vulnerable adults from mandated reporters, who include home care agency employees. RCW 74.34.005(5), .020(11). A "vulnerable adult" includes a person over age sixty with the functional, mental, or physical inability to care for himself. RCW 74.34.020(17)(a). Sarah and Stephen Evert agree that Thomasene was a vulnerable adult. Permissive reporters may also report to DSHS or a law enforcement agency when there is reasonable cause to believe that a vulnerable adult is being or has been abandoned, abused, financially exploited, or neglected. RCW 74.34.035(6). "Permissive reporter" encompasses any person. RCW 74.34.020(13).

DSHS must investigate reports of abuse and notify the alleged perpetrator of the investigation's outcome. RCW 74.34.067, .068(1). The alleged perpetrator may then challenge a finding of abuse by seeking an administrative hearing. WAC 388-71-01235, -01240. Either DSHS or the alleged perpetrator may appeal the administrative law judge's ruling to the DSHS Board of Appeals. The Board's decision is DSHS' final decision. RCW 34.05.464(4); WAC 388-71-01275(3).

11

Washington statutes outline the nature of an investigation to be conducted by APS.

RCW 74.34.067 provides, in relevant part:

> (2) In conducting the investigation, the department shall interview the complainant, unless anonymous, and shall use its best efforts to interview the vulnerable adult or adults harmed, and, consistent with the protection of the vulnerable adult shall interview facility staff, any available independent sources of relevant information, including if appropriate the family members of the vulnerable adult.

RCW 74.34.040(3) provides that reports to DSHS from mandatory reporters must contain, among other information, evidence of previous abuse, neglect, exploitation, or abandonment.

Sarah and Stephen Evert contend that the investigation conducted by APS in response to Glenn's complaint, did not comply with RCW 74.34.040 and .067. They argue that the investigation was deficient because: (1) APS investigator Ellen Rapkoch did not interview everyone listed as a possible witness on her investigation intake form, and (2) Rapkoch did not investigate allegations of past abuse perpetrated against Thomasene in Boise.

We do not address the merits of the Everts' contention, since any failure by APS to follow the statutes' investigatory directives does not invalidate a finding by APS of abuse of the vulnerable adult. No statute dictates that a negligent or defective investigation annuls APS' conclusion of abuse. The Everts cite no authority that supports reversing an APS order because of a deficient investigation. In the challenge of APS'

finding before the ALJ, the Everts could call to testify any witness they claim APS should have interviewed. Any allegations of past abuse would not excuse the Everts' abuse of Sarah's mother.

## Finding of Mental Abuse

Sarah and Stephen Evert bring this appeal pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW; *Goldsmith v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 573, 584, 280 P.3d 1173 (2012). The Everts bear the burden of demonstrating the invalidity of APS' actions. RCW 34.05.570(1)(a). This court will reverse an agency action if, as the Everts assert here:

> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court.

RCW 34.05.570(3).

When reviewing an agency decision, we apply the standards of chapter 34.05 RCW directly to the agency's record without regard to the superior court decision. *Goldsmith*, 169 Wn. App. at 584; *Burnham v. Dep't of Soc. & Health Servs.*, 115 Wn. App. 435, 438, 63 P.3d 816 (2003). This court reviews legal issues de novo, giving substantial weight to the agency's interpretation of the law it administers, particularly where the issue falls within the agency's expertise. *Goldsmith*, 169 Wn. App. at 584. Challenges brought under RCW 34.05.570(e) are reviewed for substantial evidence; that is, whether sufficient evidence exists to persuade a fair-minded person of the truth or

correctness of the order. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013), *review denied*, 179 Wn.2d 1015, 318 P.3d 279 (2014). This court views the evidence in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority. Doing so necessarily entails accepting the fact finder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences. *Spokane County*, 176 Wn. App. at 565. This court defers to the DSHS Board of Appeals' determination of the credibility of witnesses and weight of evidence. *Spokane County*, 176 Wn. App. at 565.

The Everts contend that substantial evidence does not support the DSHS Board of Appeals' ruling that the Everts mentally abused Thomasene by inappropriately isolating her from other family members. They argue that the witnesses that testified on their behalf at the administrative hearing before ALJ Pierce undermine the Board's ruling and that Thomasene was not "isolated" because she had numerous calls from family, including her younger sister and friends. She had visitors. Sarah took her to water therapy and to restaurants. DSHS contends that the record supports a finding of mental abuse by a preponderance of the evidence. We agree with DSHS.

In an action brought by DSHS alleging mental abuse of a vulnerable adult, DSHS must prove the alleged abuse by a preponderance of the evidence. *Goldsmith*, 169 Wn. App. at 584; *Kraft v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 708, 716, 187 P.3d

798 (2008). Therefore, APS must find it more likely than not that abuse occurred. *Goldsmith*, 169 Wn. App. at 584.

The abuse of vulnerable adults act, chapter 74.34 RCW defines "abuse" as:

> . . . the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult. In instances of abuse of a vulnerable adult who is unable to express or demonstrate physical harm, pain, or mental anguish, the abuse is presumed to cause physical harm, pain, or mental anguish. Abuse includes sexual abuse, *mental abuse*, physical abuse, and exploitation of a vulnerable adult, which have the following meanings.
>
>     . . . .
> (c) "Mental abuse" means any willful action or inaction of mental or verbal abuse. Mental abuse includes, but is not limited to, coercion, harassment, *inappropriately isolating* a vulnerable adult from family, friends, or regular activity, and verbal assault that includes ridiculing, intimidating, yelling, or swearing.

RCW 74.34.020(2) (emphasis added). "**Willful**" means: "the nonaccidental action or inaction by an alleged perpetrator that he/she knew or reasonably should have known could cause harm, injury or a negative outcome." WAC 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.

In arguing that the DSHS Board of Appeals decision is not supported by substantial evidence, Sarah and Stephen Evert look into a crowd and see only their friends. The Everts repeat lengthy quotes from their own witnesses in the administrative hearing. They focus only on testimony supportive of their position and ignore extensive testimony that confirms they were aggressively isolating Thomasene from her family. Substantial evidence supports APS' determination that the Everts mentally abused Thomasene by inappropriately isolating her from family members.

15

Both Sarah and Stephen Evert admitted to APS investigators that they intentionally limited Thomasene's contact with her children and husband. The Board found they moved Thomasene from Boise to Spokane without notifying all family members, and assisted her in filing for divorce despite her inability to understand the proceedings, and her advanced dementia. Thomasene Blevins and Dale McCleary were allowed to communicate with Thomasene, but they were careful to couch their conversations in nonconfrontational topics in order to avoid Stephen and Sarah's wrath. The Everts greatly restricted Thomasene's contact with Glenn, Phyllis Keith, and Glenna Kimball. As the ALJ noted, even if the Everts thought that such restrictions were in Thomasene's best interest, they were nonetheless inappropriate and disqualify the Everts from having "unsupervised contact and care over a vulnerable adult." AR at 44.

The DSHS Board of Appeals correctly noted that the Everts "assign error because they disagree with the ALJ's determinations, not because actual errors exist." AR at 16. The Board specifically found the Everts' testimony less credible than that of Sarah Evert's siblings. We will not disturb this determination on appeal.

## CONCLUSION

We affirm the superior court and the DSHS Board of Appeals' decision and final order.

16

No. 32455-9-III
*Evert v. Dep't of Soc. & Health*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____        _____
Korsmo, J.                              Lawrence-Berrey, J.

17