# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BLAKE HUEGEL,<br><br>                Appellant,<br><br>     v.<br><br>STATE OF WASHINGTON DEPARTMENT<br>OF SOCIAL AND HEALTH SERVICES,<br><br>                Respondent. | No. 59660-1-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, J.—WS, a vulnerable adult, lived in an adult family home, Vintage Years. WS's bed at Vintage Years was placed against a wall on one side and he had an upper bed rail installed on his bed on the other side. At WS's family's request, Blake Huegel, a temporary caregiver at Vintage Years, then installed a lower bed rail on WS's bed.

An upper bed rail starts at the head of the bed, runs along the side of the bed, and is about three feet long. A lower bed rail is the same length and starts at the foot of the bed. When both an upper and a lower bed rail are installed, there is an approximately one-and-a-half-foot gap between them. The lower bed rail that Huegel installed was not medically approved and left WS only a narrow gap between bed rails to exit his bed. Within a day of Huegel installing the lower bed rail, WS fell while getting out of bed and died several days later from a subdural hematoma.

The Department of Social and Health Services (the Department) investigated Huegel and found that he abused a vulnerable adult by improperly using a mechanical restraint, the lower bed rail. During the investigation, Huegel admitted that he installed the lower bed rail on WS's bed

without medical authorization and that he knew this violated regulations. After a hearing, an administrative law judge affirmed the abuse finding against Huegel. The Department's Board of Appeals (the Board) affirmed the administrative law judge's finding. The superior court affirmed the Board's order. Huegel appeals.

We conclude that the Board's unchallenged findings are verities on appeal. The Board appropriately considered hearsay evidence in this administrative proceeding, where hearsay is permitted if it is the type of evidence on which a reasonably prudent person would rely. And the three findings that Huegel challenges are supported by substantial evidence in the record, including Huegel's admissions during the investigation. The Board correctly applied the plain language of the abuse of a vulnerable adult standard because it includes the improper restraint of a vulnerable adult without medical authorization. The Board did not have to find that Huegel intended to injure WS. Finally, we recognize that the abuse finding has significant consequences, especially where WS's injuries were the result of an unfortunate accident. But under current law, placement on the registry of those who have abused vulnerable adults did not violate Huegel's procedural due process rights.

We affirm. We deny Huegel's request for appellate attorney fees.

FACTS

I. BACKGROUND FACTS

The following facts are drawn primarily from the unchallenged findings of fact in the Board's final order, which are verities on appeal. *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 100, 11 P.3d 726 (2000).

2

Blake Huegel was a licensed certified nursing assistant working in adult long-term care. He had nine years of experience in long-term care and ran multiple adult family homes. Huegel occasionally assisted his brother, Cameron Huegel, at Vintage Years, an adult family home that Cameron operated in Battle Ground, Washington. At Vintage Years, Huegel acted as a "fill-in caregiver" when Cameron was unavailable. Verbatim Rep. of Proc. (VRP) at 213. Huegel completed a training in 2016 that explicitly included "[w]hat constitutes a restraint." Admin. Rec. (AR) at 3. Under Washington law, a restraint includes "any device attached or adjacent to the vulnerable adult's body that [they] cannot easily remove that restricts freedom of movement or normal access to [their] body." Former RCW 74.34.020(15) (2019).

A.      WS's Admission to Vintage Years and Initial Assessments

WS, a 90-year-old man, began living at Vintage Years in November 2019 after falling at home and suffering severe injuries. Before WS entered the home, Vintage Years filled out a long-term care assessment for him. The care assessment noted that WS was "disoriented" and "attempted to get out of bed." AR at 6, 264. It recommended that caregivers should keep WS's bed low to the floor, remind WS to use a call signal when getting out of bed, and use a bed alarm. Vintage Years also completed a care plan for WS. The care plan did not mention bed rails, but it stated that WS was at risk for falls and that Vintage Years would keep his bed low to the ground.

In December 2019, WS attempted to get out of bed by himself and fell. He was taken to the hospital and treated for an injured hip before returning to Vintage Years in January 2020.

B.      After WS's December 2019 Fall

In December, after WS's fall, a nurse at Vintage Years completed a bed rail assessment for WS. A "bed rail," also called a "side rail," is an assistive device that can be placed on beds to help

residents reposition and maneuver in and out of bed. An upper bed rail starts at the head of the bed, runs along the side of the bed, and is about three feet long. A lower bed rail is the same length and starts at the foot of the bed. When both an upper and a lower bed rail are installed, there is an approximately one-and-a-half-foot gap between them. Many adult care facility residents use upper bed rails for mobility purposes; residents can use the upper rail to brace or steady themselves when turning over in bed, sitting up, or getting out of bed. When he lived at home, WS had upper bed rails on his bed.

The nurse, Cameron Huegel, and Polly Little, WS's daughter, all signed WS's bed rail assessment. The bed rail assessment noted that Little requested rails for WS for his "safety and mobility." AR at 10. The bed rail assessment included a section on the risks of bed rails, stating that "serious injuries can occur from falls if an individual climbs over the bed rails," and that bed rails "can induce agitation if the rail is perceived as a restraint." AR at 11. Little consented to these risks and indicated that she wanted to have upper bed rails placed on both sides of WS's bed. Ultimately, the bed rail assessment concluded that no bed rails should be used "[d]ue to positioning." AR at 12. This assessment contained no further explanation. This was the only bed rail assessment that Vintage Years conducted for WS.

During WS's follow-up visit from the December fall, his primary care provider, Dr. Gregory Hallas, noted that WS's behavior had changed significantly, including increased agitation. In Dr. Hallas' report, which he faxed to Vintage Years, he ordered "bed rails"—without distinguishing between upper and lower bed rails—as recommended medical equipment for WS "to improve bed mobility." AR at 10.

At some point after the bed rail assessment and follow-up visit, Little and Stephen Slack, WS's son, brought the upper bed rails that were previously installed on WS's bed at home to Vintage Years. Huegel installed the upper bed rails on WS's bed at Vintage Years.

After the bed rail assessment, Vintage Years also completed another long-term care assessment for WS in January 2020 because of his changed condition after the fall. The long-term care assessment noted that WS's dementia had worsened and that he had not walked since the fall. It listed bed rails as a possible form of special equipment, but did not mention bed rails in WS's assessment or care plan.

When he returned to Vintage Years from the hospital, WS became more agitated and disruptive. He would often call out or attempt to get out of bed, requiring intervention from staff. At some point in early February 2020, Little brought lower bed rails that she had purchased to Vintage Years.

Slack, WS's son, asked Dr. Hallas for recommendations that could help with WS's behavior, and Dr. Hallas referred WS to a geriatric psychology specialist and increased his evening dose of medication. On February 10, Vintage Years faxed Dr. Hallas's clinic a note stating that WS's behaviors had worsened, and he was upsetting other residents and attempting to hit staff. The note requested "a bed rail order faxed to us *as soon as possible*, please." AR at 216. A nurse at the clinic wrote in WS's medical record that she called Deanna Williams, WS's primary caretaker, on February 12 and told her that Vintage Years could not install additional bed rails without a doctor's order. The nurse told Williams, "having full sets of bedrails on bed can potentially cause increase risk of injury as [WS] can fall over bed/siderails to ground, increasing height distance to ground compared with 1 rail on each side of bed." *Id.*

The nurse then forwarded a note to Dr. Hallas, asking, "If OK with bed rails, please clarify: 2 rails on each side (4 in total/bed) OR 1 rail on each side (2 total/bed)?" *Id.* This sparked an internal conversation at the clinic about WS's treatment, and on February 12, Dr. Hallas wrote, "Bed rails are restricted to a certain coverage—I do not know what that is and cannot advise anything other than that." AR at 217. About an hour later, another nurse wrote Dr. Hallas, "OK to order 2 upper bed rails for safety" and attached a federal website outlining the definition of "restraint." *Id.* Based on WS's medical records, the clinic had no further communication with Vintage Years on February 12.

C.      WS's February 2020 Fall

In the meantime, on or around February 12, someone installed the lower bed rail Little brought for WS's bed, though there is a factual dispute as to who installed it. It is undisputed that on the night of February 12, WS had upper and lower bed rails on one side of his bed, and the other side of the bed was pushed against a wall.

In the evening of February 12, Williams found WS on the ground. Williams called 911 and first responders took WS to the hospital. Nobody witnessed WS fall. At the hospital, WS had a brain scan and was diagnosed with only cervical strain and minor injuries to his hip and toenail. He returned to Vintage Years later that night.

There were conflicting accounts about how WS got out of bed and onto the ground. During Williams' 911 call, she said WS "was in his hospital bed, and he has double rails, and somehow he fell over the rails onto the floor . . . he worked himself out of bed over the rails." AR at 180. But WS's medical team expressed doubt that WS had the strength to lift himself over the bed rails.

And later Williams stated that WS must have crawled out of the one-and-a-half-foot gap between the rails because he was too weak to pull himself over the bed rails.

Three days after his fall, WS began having seizures as a result of a subdural hematoma. He eventually died in hospice a few days later.

## II. PROCEDURAL HISTORY

### A.      Investigations

After WS's death, the Department received a report of potential abuse involving Huegel and WS, and it assigned Adult Protective Services Social Worker Taylor Bonnett to investigate the case. As part of the investigation, Bonnett visited Vintage Years and interviewed Huegel, Little, Slack, Williams, Dr. Hallas, and other caregivers. Bonnett also reviewed WS's care plans, bed rail assessments, medical records, and the 911 call Williams made after WS fell.

Residential Care Services also started an investigation into WS's care at Vintage Years, led by Shawn Swanstrom.

### 1.      Investigation findings

During the Residential Care Services investigation, Huegel told Swanstrom that he "placed the lower set of half side rails on [WS's] bed . . . at family request." AR at 331. According to Bonnett's investigation notes, when she asked "who physically put the bed rail on," Huegel replied, "'I did.'" AR at 163. Huegel said that when Little brought the lower bed rail to Vintage Years, he told Little that she needed "proper documentation" before installing it. *Id.* Huegel told Bonnett that Little assured him she would work on getting proper documentation for the lower bed rail, but he "should have looked past [Little] for the actual document." AR at 166. When Bonnett asked Huegel directly if he had a doctor's order for the bed rail before installing it, he said, "'[N]o I didn't have

7

it in hand, I should have asked for it. I took [Little's] verbal word for it, but I know that's not what you need to do.'" *Id.* Little also initially told Bonnett that Huegel installed the lower bed rail.

In her interviews with Swanstrom and Bonnett, Williams, WS's primary caretaker, claimed that Huegel installed the lower bed rail on WS's bed even after she told him and Little that Vintage Years did not have a doctor's order for it.

The investigation also revealed that on February 14, two days after WS's fall, Alexandra Hacherl, a nurse at Dr. Hallas's clinic, wrote that she spoke to Williams about WS's sleeping arrangements. Hacherl informed Williams that

> upper and lower bed rails on one side with the other side of bed being against the wall is considered a restraint – this would be the same as bed rails x 4 (2 on each side) which is also a restraint. Facility staff should not be using any bed rails at this time since [Dr. Hallas] has not provided order for this.

AR at 218. Hacherl noted that when asked, Williams said Huegel installed the lower bed rail. According to Hacherl's report, Williams claimed that she told Huegel he needed medical authorization for the lower bed rail, but he ignored her.

Bonnett interviewed Slack, WS's son, but Slack did not say that he installed the lower bed rail. He stated only that WS "had a prescription for the bed rails and the facility would not utilize them without the doctor's orders." AR at 170. He also stated that WS's family was "happy with the service" that Vintage Years provided to WS. *Id.*

Dr. Hallas told Bonnett that he did not authorize lower bed rails. After WS's fall, Dr. Hallas's office said that they would not have approved a lower bed rail for WS because WS often attempted to get out of bed, and a lower bed rail would have posed a safety concern.

8

2.    Investigation outcomes

Ultimately, based on Swanstrom's investigation findings, Residential Care Services found that Vintage Years violated several adult family home regulations, including failure to try less restrictive alternatives before using the lower bed rail and failure to complete a bed rail assessment for the lower bed rail.

In February 2021, Adult Protective Services made an initial finding of abuse of a vulnerable adult against Huegel. The finding stated that Huegel improperly restrained WS by placing a lower bed rail on his bed. Abuse of a vulnerable adult is a "willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult." Former RCW 74.34.020(2). Unreasonable confinement includes "improper use of restraint against a vulnerable adult," which is the "inappropriate use of chemical, physical, or mechanical restraints for convenience or discipline or in a manner that . . . is not medically authorized." Former RCW 74.34.020(2)(e)(ii). A "mechanical restraint" is "any device attached or adjacent to the vulnerable adult's body that [they] cannot easily remove that restricts freedom of movement or normal access to [their] body." Former RCW 74.34.020(15).

Adult Protective Services notified Huegel of the initial abuse finding by letter. Huegel requested a hearing before an administrative law judge to review the initial finding.

B.    Administrative Hearing and Board Review

1.    Hearing testimony

Huegel represented himself at the hearing. During the hearing, witnesses generally testified consistently with the facts described above but there were some factual disputes.

Huegel testified that he did not install the lower bed rail and did not see it installed on WS's bed until after the fall. He attributed his previous admissions to confusion about whether the investigators were asking about upper or lower bed rails: "The uppers, I installed when they came with the bed, because I was just helping the family set the bed up. And then the lowers, the family brought, and I'm not aware of who installed those." VRP at 81. However, Bonnett and Swanstrom both testified that they believed Huegel was referring to the lower bed rail during their interviews with him.

Little testified at the hearing that she thought her brother, Slack, installed the lower bed rail. She admitted that she did not see who actually installed the lower bed rail, but "it was like [Slack] to just hook it up while he was there." VRP at 204. Cameron Huegel testified that Slack said he would be "more than willing" to put on the lower bed rail if Vintage Years could not, but Cameron also did not see who installed the lower bed rail on WS's bed. VRP at 213. Slack did not testify at the hearing because he had since passed away.

Despite multiple attempts to contact her, Williams did not testify at the hearing.

2.      Orders and appeals

After the hearing concluded, the administrative law judge issued an initial order affirming Adult Protective Services' initial finding that Huegel improperly restrained a vulnerable adult. Huegel appealed the initial order to the Board.

The Board affirmed the initial order and issued a final order finding that Huegel improperly restrained a vulnerable adult. The Board made several key findings that Huegel challenges on appeal.

10

First, the Board found that "it is more likely than not that [Huegel] installed the lower bed rail" on WS's bed. AR at 33 (Finding of Fact (FF) 137). It relied on Huegel's and Williams' statements to investigators, as well as testimony from the investigators during the hearing. The Board determined that Huegel's, Little's, and Cameron's testimony about who installed the lower bed rail was not credible because it was either speculative or contradicted earlier interview statements. It also found that Williams, though she did not testify, was credible because her statements about Huegel installing the lower bed rail were consistent.

Second, the Board found that the lower bed rail was not "medically authorized." AR at 36 (FF 138). It cited WS's medical and care records, hearing testimony, and the investigators' interviews with Huegel, Dr. Hallas' office, and Williams. Though Little indicated that she had contact with Dr. Hallas and brought a bed rail order to Vintage Years, the Board determined that her testimony was not credible because she expressed confusion about which rails were medically approved. Little's belief that the lower bed rail was authorized was also contradicted by other evidence. Medical records from Dr. Hallas's office show that on the day of WS's fall, Vintage Years asked whether a lower bed rail was approved, which the Board concluded "supports a finding [WS's] caretaker did not believe there was medical authorization for the lower bed rail." AR at 37 (FF 138). Additionally, Huegel himself claimed that after he installed the bed rails, he told Little that they still needed medical authorization and Little said she was working on it. Huegel told Bonnett that he did not have authorization when he installed the bed rails, and he acknowledged that he should have had a bed rail order. And Williams claimed that when Little brought the lower bed rail to Vintage Years, Williams advised both Little and Huegel that they needed medical authorization to install the bed rail.

Finally, the Board applied the preponderance of the evidence standard to Huegel's actions, stating that it "need not decide what actually happened" and only must "determine what most likely happened" regarding the abuse finding against Huegel. AR at 37 (FF 139). Based on the plain language of the statute outlining abuse of a vulnerable adult through improper use of restraint, former RCW 74.34.020(2), the Board concluded that to make an abuse finding against Huegel, "[i]t only needs to be proven by a preponderance of the evidence that the installation of the lower bed rails was not medically authorized and [Huegel] knew this." AR at 48 (Conclusion of Law 19). Applying this standard to its findings of fact, the Board concluded that Huegel had improperly restrained WS. Thus, it affirmed the administrative law judge's initial order.

Huegel petitioned for judicial review and the superior court affirmed the Board's decision. Huegel appeals.

## ANALYSIS

### I. ADMISSION OF WILLIAMS' STATEMENTS

#### A.     Hearsay

Huegel argues that the Board's challenged findings are erroneous because they improperly rely on hearsay evidence. Specifically, he claims that the Board improperly relied on Williams' hearsay statements documented in Bonnett's investigative notes and Hacherl's medical notes. He also claims that the Board erred by relying on Williams' hearsay statements because Huegel could not confront her as a witness during the hearing. We disagree.

"Hearsay" is "a statement made outside of the hearing used to prove the truth of what is in the statement." WAC 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(3). Under the Washington Administrative Procedure Act, ch. 34.05 RCW, hearsay evidence is admissible in an administrative hearing if "it is the kind of

evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1). This kind of hearsay evidence is admissible "even if it would be inadmissible in a civil trial." RCW 34.05.461(4). However, a finding cannot rely exclusively on normally inadmissible hearsay evidence unless the Board determines that it "would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence." *Id.*

Specifically for Department hearings, an administrative law judge can consider hearsay evidence but can "only base a finding on hearsay evidence if the [administrative law judge] finds that the parties had the opportunity to question or contradict it." WAC 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(3). However, there is no constitutional confrontation right in civil administrative cases. *See* U.S. CONST. amend VI; WASH. CONST. art. I, § 22; RCW 10.52.060.

In *McDaniel v. Department of Social & Health Services*, Division Three held that the Department improperly relied only on written hearsay evidence in investigative reports. 51 Wn. App. 893, 897, 756 P.2d 143 (1988). The court stated that in Department hearings, "some testimonial evidence should be presented corroborating the investigative reports in order to avoid reliance solely on hearsay and conjecture." *Id.*

Here, the Board did not improperly rely on hearsay evidence about Williams' statements, as the investigators' contemporaneous reports and their consistent testimony about what Williams told them are "the kind of evidence on which reasonably prudent persons are accustomed to rely." RCW 34.05.452(1). Moreover, the Board relied on several different pieces of evidence in addition to Williams' statements, including Huegel's own admissions and the investigators' testimony.

Huegel also had the opportunity to question or contradict Williams' hearsay statements. During the hearing, Huegel had the opportunity to question Bonnett and Swanstrom about

Williams' statements and to testify himself. This allowed him to contradict the content of Williams' statements.

Unlike in criminal cases, there is no constitutional confrontation right in civil administrative hearings like the one in this case. And even though Williams made statements outside of the hearing, they are the type of statements that a reasonable person would rely on because they were consistent as she spoke to multiple people before and during the investigative process.

The Board did not err by relying on Williams' hearsay statements.

B.       Huegel's Other Arguments for Excluding Williams' Statements

In addition to the general argument that Williams' statements were inadmissible hearsay, Huegel makes several other arguments attempting to show they should have been excluded.

First, Huegel claims that the Board should have excluded Williams' statements because they were unreliable under the factors outlined in *State v. Parris* to determine the trustworthiness of out-of-court statements. 98 Wn.2d 140, 146, 654 P.2d 77 (1982). But *Parris* addressed the admissibility of hearsay evidence in a criminal case, not an administrative hearing. *Id.* at 142. Huegel cites a case where Division One applied the *Parris* factors to determine the admissibility of child hearsay regarding sexual abuse in an administrative proceeding. *Fettig v. Dep't of Soc. & Health Servs.*, 49 Wn. App. 466, 475, 744 P.2d 349 (1987). But Division One only used the *Parris* factors as a "reference point" because "no specific rules" governed the admissibility of that specific kind of evidence in administrative proceedings. *Id.* at 473. The opinion also acknowledged Washington's permissive statutory standard for hearsay evidence in administrative proceedings.

*Id.* No case law supports the claim that the *Parris* factors must be applied to determine the admissibility of all hearsay evidence in administrative hearings.

Finally, Huegel argues that the Board should not have relied on Williams' hearsay statements because they were not the "best evidence reasonably obtainable" when she could have testified at the hearing. Appellant's Opening Br. at 26-27. Huegel cites *Nisqually Delta Association v. City of DuPont*, which held that hearsay evidence is admissible only if it is "'the best evidence reasonably obtainable.'" 103 Wn.2d 720, 733, 696 P.2d 1222 (1985) (quoting former WAC 461-08-180, *repealed by* Wash. St. Reg. 96-15-002 (effective Aug. 3, 1996)). But *Nisqually* was decided before RCW 34.05.452(1) was enacted in 1988, and it interpreted a regulation about admissibility of evidence for a different administrative agency's proceedings. *Id.* at 733-34. The current standard for Department admissibility of hearsay evidence controls.

Huegel's additional arguments for excluding Williams' statements all fail.

## II. SUBSTANTIAL EVIDENCE

The Board's order included three findings that Huegel challenges on appeal: (1) Huegel installed the lower bed rail, AR at 33 (FF 137); (2) the lower bed rail was not medically authorized, AR at 36 (FF 138); and (3) the Board only needed to "determine what most likely happened" to affirm the abuse finding against Huegel, AR at 37 (FF 139).

Huegel argues that findings of fact 137, 138, and 139 are not supported by substantial evidence. We disagree.

### A. Standard of Review

When reviewing administrative appeals, this court examines the agency's final decision, not the decision from the trial court. *Morawek v. City of Bonney Lake*, 184 Wn. App. 487, 491,

337 P.3d 1097 (2014). Under the Administrative Procedures Act, this court will overturn a final agency decision if it relies on factual findings "not supported by evidence that is substantial when viewed in light of the whole record." RCW 34.05.570(3)(e). Substantial evidence supports a challenged factual finding if "the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true." *Pac. Coast Shredding, LLC v. Port of Vancouver, USA*, 14 Wn. App. 2d 484, 501, 471 P.3d 934 (2020). When determining if substantial evidence supports a factual finding, we do not "reweigh evidence or judge witness credibility but, instead, defer to the agency's broad discretion in weighing the evidence." *Whidbey Env't Action Network v. Growth Mgmt. Hr'gs Bd*., 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020). Unchallenged findings of fact from the Board's final order are verities on appeal. *Postema*, 142 Wn.2d at 100.

The standard of proof for a Department abuse of a vulnerable adult finding is a preponderance of the evidence. *Kraft v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 708, 716, 187 P.3d 798 (2008). A preponderance of the evidence supports an abuse finding if "it is more likely than not" that the alleged conduct occurred. WAC 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.

B.    Findings of Fact in the Board's Final Order

1.    Finding of fact 137

Huegel first challenges the Board's finding that he installed the lower bed rail. The Board acknowledged that there was conflicting evidence in the record about whether Huegel installed the lower bed rail. However, Huegel told both Bonnett and Swanstrom that he installed the lower bed rail. The investigators also both testified during the hearing that Huegel made these statements and they understood him to be talking about installing the lower bed rail.

Williams did not testify at the hearing, but in her interviews with Swanstrom and Bonnett, Williams claimed that Huegel installed the lower bed rail on WS's bed even after she told him that Vintage Years did not have a doctor's order for it. And Hacherl, a nurse at Dr. Hallas's clinic who also did not testify at the hearing, noted in her incident report that Williams said Huegel installed the lower bed rail despite her warning.

Though there is disputed testimony in the record about whether Huegel installed the lower bed rail, this court does not reweigh evidence or determine witness credibility. *Whidbey Env't Action Network*, 14 Wn. App. 2d at 526. The evidence that the Board relied on—including Huegel's statements to Bonnett and Swanstrom and Williams' statements—is sufficient to persuade a fair-minded person that Huegel installed the lower bed rail on WS's bed. Accordingly, we hold that there was substantial evidence to support this finding.

2.      Finding of fact 138

Next, Huegel argues that substantial evidence does not support the Board's finding that the lower bed rail was not medically authorized. We disagree.

Neither WS's bed rail assessment nor any of his care plans authorized any bed rails. The Board acknowledged that one medical note from Dr. Hallas authorized bed rails, but the note does not specify whether it references upper or lower bed rails. Dr. Hallas "repeatedly declined to make any recommendations" when asked directly about lower bed rails. AR at 36. In fact, Dr. Hallas and his staff expressly stated that they did not, and would not, approve lower bed rails. Huegel also admitted to the investigators that he never saw a doctor's order authorizing the lower bed rail, and that he should not have put the lower bed rail on WS's bed without confirmation that it was

authorized. This evidence is sufficient to persuade a fair-minded person that a lower bed rail was not authorized.

       3.        Finding of fact 139

Concluding its findings of fact, the Board wrote that it "need not decide what actually happened" and only must "determine what most likely happened" regarding the Department's findings. AR at 37. We recognize that this not a finding of fact, but rather a statement about the burden of proof, which is a legal determination. Huegel argues that the Board misstated the standard of proof for an abuse finding. We disagree.

The standard of proof for an administrative abuse of a vulnerable adult finding is a preponderance of the evidence, which means "it is more likely than not that something happened." WAC 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. In the Board's explanation of its findings, it would have been better to recite the "more likely than not" standard precisely, rather than saying it needed only to determine what "most likely happened." AR at 37. But here, there were only two versions of events: either Huegel installed the lower bed rails with authorization or he did not. Thus, the Board's reference to what "most likely happened" does not depart from the "more probable than not" standard as it might if more than two versions of events were presented. In this case, the Board's reiteration of the standard was not error, though we encourage the recitation of the precise "more likely than not" standard in future cases.

III. INTERPRETATION AND APPLICATION OF THE ABUSE OF VULNERABLE ADULTS STATUTE

Huegel argues that the Board misinterpreted the abuse standard from the "Abuse of Vulnerable Adults Act," ch. 74.34 RCW. He claims that he did not "willfully" restrain WS because he did not intend to cause WS injury, and in fact, he was attempting to protect WS. Based on its

interpretation of former RCW 74.34.020(2), the Board concluded that the Department need not show that Huegel intended to injure WS. Instead, the Board stated that the Department had to prove "by a preponderance of the evidence that the installation of the lower bed rails was not medically authorized and [Huegel] knew this, to support the conclusion that [Huegel's] actions constituted an improper use of restraints." AR at 48. We agree with the Board's interpretation.

A.      Definition of Abuse

1.      Legal principles

"When reviewing an administrative agency decision, we review issues of law de novo." *Karanjah v. Dep't of Soc. & Health Servs.*, 199 Wn. App. 903, 914, 401 P.3d 381 (2017). However, we give "'substantial weight to the agency's interpretation of the law it administers, particularly where the issue falls within the agency's expertise.'" *Id.* (quoting *Goldsmith v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 573, 584, 280 P.3d 1173 (2012)).

Under former RCW 74.34.020(2), "abuse" is a "willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult." Unreasonable confinement includes "improper use of restraint against a vulnerable adult," which is the "inappropriate use of chemical, physical, or mechanical restraints for convenience or discipline or in a manner that . . . is not medically authorized." Former RCW 74.34.020(2)(e)(ii). A "mechanical restraint" is "any device attached or adjacent to the vulnerable adult's body that [they] cannot easily remove that restricts freedom of movement or normal access to [their] body." Former RCW 74.34.020(15).

The statute does not define "willful" action. In *Crosswhite v. Department of Social & Health Services*, the Supreme Court held that an abuser of a vulnerable adult acts "willfully" only

if they "knowingly inflict injury, unreasonable confinement, intimidation, or punishment." 197 Wn. App. 539, 551, 389 P.3d 731 (2017). In other words, an abuser must "'act[] knowingly with respect to the material elements of the offense.'" *Id.* at 553 (emphasis omitted) (quoting RCW 9A.08.010(4)). For example, "[y]elling at a vulnerable adult that is nonaccidental and that nonaccidentally inflicts a type of harm identified by [former] RCW 74.34.020(2) is willful. Yelling that is nonaccidental but that causes a statutory harm *accidentally* or *without purpose* is not." *Id.*

In *Brown v. Department of Social & Health Services*, Brown, a caretaker at an assisted living facility, physically restrained a resident who had attempted to assault other patients and staff in the facility by grabbing the resident and holding her down. 145 Wn. App. 177, 180-81, 185 P.3d 1210 (2008). Division Three held that Brown's actions did not constitute abuse because Brown did not intend to cause the resident injury, but rather to protect other people from potential danger posed by the resident. *Id.* at 183. Thus, Brown's actions "were warranted and not abusive." *Id.* The court determined that "[b]oth the definition of 'abuse' and 'physical abuse' require a willful action to inflict injury. Further, 'abuse' may entail 'unreasonable' confinement." *Id.*

This court applied *Brown*'s reasoning in *Karanjah*. 199 Wn. App. at 921. Karanjah, a caregiver for adults, saw a resident with fecal matter on his hands attempt to hit another caregiver. *Id.* at 908. Karanjah also knew that this resident often entered the rooms of other residents and wanted to avoid spreading fecal matter to other residents' rooms. *Id.* at 908, 911. Karanjah took the resident's wrists and escorted him down the hallway, and the resident allegedly injured himself while flailing in Karanjah's grip. *Id.* at 908. The court held that Karanjah did not intend to injure the resident, but that the resident's injuries resulted from an accident. *Id.* at 923. Because

Karanjah's actions were "clearly protective and not knowingly injurious or ill intended," Karanjah did not abuse the resident. *Id.* at 924.

2.       Analysis

Abuse in this context is "willful action or inaction that inflicts injury, unreasonable confinement, intimidation, *or* punishment on a vulnerable adult." Former RCW 74.34.020(2) (emphasis added). Based on the use of the disjunctive "or" in the statute, abuse includes either willful action that inflicts injury *or* willful action that inflicts unreasonable confinement. *See Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 319, 190 P.3d 28 (2008) ("As a default rule, the word 'or' does not mean 'and' unless legislative intent clearly indicates to the contrary."). Thus, applying *Crosswhite*'s definition of "willful," an individual commits abuse if they knowingly inflict unreasonable confinement on a vulnerable adult. The "knowingly" applies to all material elements of the offense: the individual doing the act must know that the action is confinement and that it is unreasonable. Under the plain language of former RCW 74.34.020(2)(e)(ii), Huegel did not have to intend to cause injury for a finding of abuse; he only needed to intend to cause unreasonable confinement through use of restraint that he knew was not medically authorized.

Huegel completed a training on "[w]hat constitutes a restraint." AR at 3. Participation in the training was circumstantial evidence that Huegel knew what actions might produce an unreasonable confinement. Huegel also admitted that he knew he needed medical authorization before installing bed rails, and he failed to actually receive that authorization before installing the lower bed rail. This evidence demonstrates that Huegel, more likely than not, knew WS's

confinement was unreasonable under the terms of the statute because he knew that mechanical restraints must be—and in this case were not—medically authorized.

Huegel relies on *Brown* to support his claim that the finding of abuse must be supported by evidence that he intended to cause injury. He quotes *Brown*'s holding that "'[b]oth the definition of 'abuse' and 'physical abuse' require a willful action to inflict injury.'" Appellant's Opening Br. at 41 (quoting *Brown*, 145 Wn. App. at 183). However, Huegel omits the next sentence from *Brown*, which states, "[f]urther, 'abuse' may entail 'unreasonable' confinement." *Brown*, 145 Wn. App. at 183. In both the statute and in *Brown*, unreasonable confinement exists as its own form of abuse separate from injury. Huegel also cites *Karanjah*, but in that case, the court focused on injury resulting from physical abuse and did not address the willfulness requirement for unreasonable confinement. 199 Wn. App. at 923-24.

Huegel also argues that his actions were meant to protect WS, so they could not constitute abuse. Huegel may have intended to keep WS from getting injured from falling out of bed by installing the lower bed rail, but this argument actually supports the conclusion that Huegel intended to restrain WS by installing the lower bed rail. And it does not negate the fact that Huegel knew he needed medical authorization and did not have it before installing the lower bed rail.

The dissent contends that the Board did not enter a finding or conclusion that Huegel knowingly used "inappropriate" mechanical restraint. But the Board found that "the evidence supports the fact that [Huegel] was aware his installation of the lower bed rails inflicted unreasonable confinement on a vulnerable adult and was, thus, improper." AR at 48. Further, the Board's decision incorporates the administrative law judge's conclusions of law by reference. The administrative law judge's conclusions of law contain a clear statement that "the record supports

a conclusion Huegel knowingly inflicted *inappropriate* unreasonable confinement on [WS]." AR at 93 (emphasis added).

The dissent also reasons that WS's family's permission and assurances that they would obtain medical authorization made the use of the lower bed rails reasonable and appropriate under these circumstances. But this is not the law, and for good reason. Where a vulnerable adult is difficult to care for, it is not hard to imagine a situation where a family's desires to use mechanical restraint might conflict with what the vulnerable adult's doctors have concluded is safe or in their best interest. The Department's and the caregiver's responsibility is to the vulnerable adult, not the family, and allowing a loophole for family permission would endanger vulnerable adults.

Even though Huegel's actions may have been motivated by a desire to protect WS from another fall, they meet the statutory requirements for abuse of a vulnerable adult through improper use of restraint because Huegel knowingly installed the lower bed rail without medical authorization.

3.       Huegel's other arguments

Huegel makes several other arguments about the interpretation and application of the abuse statute which also fail.

First, Huegel claims that he did not abuse WS because he did not restrain WS "'for convenience or discipline.'" Appellant's Opening Br. at 57. However, under former RCW 74.34.020(2)(e)(ii), an individual improperly restrains a vulnerable adult if he uses mechanical restraints "for convenience or discipline *or* in a manner that . . . is not medically authorized." (emphasis added). Thus, the Department was not required to find that Huegel acted for

convenience or discipline. The statute's use of "or" establishes that the Department only needed to find that the mechanical restraint, in this case WS's lower bed rail, was not medically authorized.

Huegel argues that the vulnerable adult abuse finding based on improper use of restraint is erroneous, because Huegel relied on Little's assertion that WS had a doctor's order for the lower bed rail. Thus, Huegel did not know that the lower bed rail was not medically authorized. However, Huegel admitted that he did not see the medical authorization for the bed rails and knew he should have asked for it. This makes sense because a family member's authorization alone does not—and should not—relieve a caregiver of the independent responsibility to avoid unreasonable confinement of a vulnerable adult. Because Huegel was aware that he needed medical authorization before installing the lower bed rail, and that Little's word alone was not proper authorization, his argument fails.

Huegel contends that he did not improperly restrain WS because WS was able to get out of bed between the gaps in the upper and lower bed rails. Under former RCW 74.34.020(15), a "mechanical restraint" includes "any device . . . adjacent to the vulnerable adult's body that [they] cannot easily remove that restricts freedom of movement." Here, the lower bed rail was adjacent to WS's body, as it was attached to his bed. And the lower bed rail restricted WS's movement because there was limited space to get out of the bed, which was placed against a wall on the other side. Huegel completed a training about what constitutes a restraint, so there is evidence that he knew a lower bed rail would fall under the definition of improper restraint. Dr. Hallas's office also stated that, in this context, a lower bed rail would be considered a restraint. Huegel's argument that the lower bed rail was not a restraint thus fails.

Huegel argues that the vulnerable adult abuse finding based on improper use of restraint is erroneous because it was Vintage Years, not Huegel, who had a duty to obtain proper medical authorization for the lower bed rail. However, whether Huegel had a duty *to obtain* medical authorization for the bed rail is irrelevant to the Board's decision. In this case, the ultimate question is simply whether Huegel willfully used improper restraint against WS without medical authorization. Under the plain terms of the statute, Huegel had a responsibility to determine whether the lower bed rail was medically authorized for use on WS's bed before installing it. Former RCW 74.34.020(2)(e)(ii). This responsibility existed separately from any duty Vintage Years had to obtain medical authorization before allowing its caregivers to install a lower bed rail.

Finally, Huegel claims that he did not abuse WS because, even if Huegel had installed the lower bed rail, there is no proof that Huegel's actions caused WS to fall from his bed. However, former RCW 74.34.020(2) does not require actual injury for a finding of abuse: unreasonable confinement alone is sufficient.

In sum, the Board did not err by concluding that Huegel's actions met the definition of abuse under former RCW 74.34.020.

B.      Procedural Due Process

Huegel argues that the Department deprived him of a constitutionally protected liberty interest by finding that he abused WS and placing him on a permanent registry that prevents him from working or volunteering with vulnerable adults in the future. We disagree.

State governments may not deprive a person of life, liberty, or property without due process of law. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 216, 143 P.3d 571 (2006) (citing U.S. CONST. amend. XIV, § 1). A person has a protected liberty interest in the pursuit "of an occupation or

profession" *Id.* at 219. When a state deprives a person of a protected liberty interest, "procedural due process requires that [the] individual receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation." *Id.* at 216.

*Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), outlines a balancing test to "determine whether procedures that deprive a person of a protected interest 'satisfy the requirements of the Fourteenth Amendment.'" *Romero v. Dep't of Soc. & Health Servs.*, 30 Wn. App. 2d 323, 339, 544 P.3d 1083 (2024) (quoting *In re De Facto Parentage of A.H.*, 28 Wn. App. 2d 412, 425, 536 P.3d 719 (2023)). Under *Mathews*, we balance the protected interest at stake, the risk that an individual will be erroneously deprived of that protected interest under existing procedures, and the government's interest. 424 U.S. at 335.

The Department is required to investigate reports of abuse of a vulnerable adult. Former RCW 74.34.063(1) (2017).[1] When the Department finalizes a substantiated finding that a caregiver or other person abused a vulnerable adult, the perpetrator is put on a vulnerable adult abuse registry. Former RCW 74.39A.056(3) (2018); WAC 388-103-0170. Placement on the registry is permanent unless the Department determines the finding was erroneous, the finding is overturned by judicial review, or the perpetrator passes away. WAC 388-103-0180. An individual on the vulnerable adult abuse registry cannot "be employed in the care of and have unsupervised access to vulnerable adults." Former RCW 74.39A.056(2).

In *Romero*, this court held that the Department did not violate nursing assistants' procedural due process rights by putting them on the permanent vulnerable adult abuse registry.

---

[1] Although we cite to the version of these statutes in effect when this case arose, the statutory language has not significantly changed.

30 Wn. App. 2d at 339. We acknowledged that an "individual's interest in pursuing their chosen profession without arbitrary government interference is significant and well-established." *Id.* at 342. However, "it is undisputed that [the Department] has a strong interest in protecting vulnerable adults and in avoiding excessive administrative burdens on the agency." *Id.* Though we expressed concern with the due process implications of this kind of permanent registry, we were ultimately bound by the law established in *Fields v. Department of Early Learning*, 193 Wn.2d 36, 434 P.3d 999 (2019) (plurality opinion). *Id.* at 345.

We reiterate those concerns here. Though Huegel's actions meet the statutory definition for abuse of a vulnerable adult through improper use of restraint, permanent disqualification from his chosen profession is an extraordinary result under the circumstances of this case. Huegel may have known that he needed medical authorization before installing the lower bed rail, but there is no evidence on this record that Huegel acted in bad faith towards WS. In fact, looking to WS's behaviors before his last fall, there is evidence that WS's family members and Huegel were attempting to protect WS by installing the lower bed rail. Neither WS's family, nor Vintage Years at the time, thought that WS's last fall was anything more than a tragic accident. Permanent disqualification from caring for vulnerable adults is an exceptional consequence for a mistake such as this one. Moreover, we have previously recognized:

> The direct care workforce—encompassing "workers who provide essential support services to the elderly and disabled"—"is primarily composed of low-income women, people of color, and immigrants." John D. Blum & Shawn R. Mathis, *Forgotten on the Frontlines: The Plight of Direct Care Workers During COVID-19*, 98 U. DET. MERCY L. REV. 325, 327, 329 (2021). "Almost half of [direct care workers] are employed part-time, where low wages and lack of benefits often force them to have multiple jobs." *Id.* at 329. Their work is "emotionally taxing," and the injury rates "are high due to the physical demands inherent in providing assistance with activities of daily living." *Id.* Direct care workers also frequently face "client

aggression and violence, sexual harassment, and discrimination." *Id.* It is not surprising that under these difficult working conditions, mistakes can happen.

*Romero*, 30 Wn. App. 2d at 343 (alteration in original). We acknowledge that the law does not currently allow a more nuanced approach to single findings of abuse or neglect against a vulnerable adult. But perhaps a more nuanced approach is worthy of legislative or Department consideration in light of cases like this one.

In *Fields*, the Washington Supreme Court upheld the validity of administrative regulations that permanently barred people with certain convictions from providing licensed childcare. 193 Wn.2d at 52. The Department's abuse of vulnerable adult regulations operate similarly to those in *Fields*, so they are not unconstitutional under that case. *Romero*, 30 Wn. App. 2d at 344.

Here, like the nursing assistants in *Romero*, Huegel received notice of the abuse finding and requested an administrative hearing. At the administrative hearing, Huegel called and cross-examined witnesses, presented documentary exhibits, and testified himself. After the hearing, Huegel was able to appeal the initial order to the Board and appeal the Board's order to superior court. Though permanent placement on a vulnerable adult registry that severely limits Huegel's future opportunities in his chosen career, and is a heavy burden on a protected interest, Huegel had access to significant procedural process before his abuse finding was finalized. Under *Fields*, and given the government's strong interest in protecting vulnerable adults, the Board's finding of abuse of a vulnerable adult did not violate Huegel's procedural due process rights.

C.      Arbitrary and Capricious

Huegel argues that the Board's finding of abuse is arbitrary and capricious because it ignored relevant facts and misapplied existing law. We disagree.

No. 59660-1-II

This court reviews whether a final administrative decision is arbitrary and capricious de novo. *Karanjah*, 199 Wn. App. at 924. "'A decision is arbitrary and capricious if it is willful and unreasoning, and disregards or does not consider the facts and circumstances underlying the decision.'" *Id.* at 925 (quoting *Stewart v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 266, 273, 252 P.3d 920 (2011)).

Here, the Board wrote a thorough final order reviewing the relevant facts and applying the appropriate law. Because we affirm the challenged factual findings and legal basis for the Board's final order, it was not arbitrary and capricious.

## ATTORNEY FEES

Huegel argues that he is entitled to attorney fees as a prevailing qualified party under RCW 4.84.350. But Huegel must prevail in order to obtain attorney fees under RCW 4.84.350(1). Because we affirm the Board's order in its entirety, Huegel did not prevail in a judicial review of an agency decision. Thus, he is not entitled to attorney fees.

## CONCLUSION

We affirm. We decline to award Huegel attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

I concur:

PRICE, J.

29

MAXA, P.J. (dissenting) – The Department of Social and Health Services found that Blake Huegel abused a vulnerable adult by installing a lower bed rail on WS's bed. Former RCW 74.34.020(2) (2019) defined abuse as a "willful" action that inflicted "unreasonable" confinement or used "inappropriate" mechanical restraints. Because the evidence does not support a finding that Huegel willfully inflicted unreasonable confinement or used inappropriate restraints, I dissent.

Former RCW 74.34.020(2) stated that "abuse" means a "*willful* action or inaction that inflicts injury, *unreasonable* confinement, intimidation, or punishment on a vulnerable adult." (Emphasis added.) Former RCW 74.34.020(2) stated that "abuse" also included "improper use of constraint." "Improper use of restraint" included "the *inappropriate* use of . . . mechanical restraints . . . in a manner that: . . . (ii) is not medically authorized." Former RCW 74.34.020(2)(e) (emphasis added). Former RCW 74.34.020(2) did not define "willful," "unreasonable," or "inappropriate."

In *Crosswhite v. Department of Social and Health Services*, the court held that the term "willfully" meant that "an abuser must knowingly inflict . . . unreasonable confinement." 197 Wn. App 539, 551, 389 P.3d 731 (2017). Here, Huegel deliberately installed the lower bed rail, which arguably confined WS. But there is no indication in the record that Huegel knew that installation of the lower bed rail was "unreasonable." Polly Little, WS's daughter, purchased the lower bed rail, and there was undisputed evidence that she asked that the lower bed rail be installed for WS's safety. Deanna Williams told an investigator that the family wanted the lower bed rail to keep WS in his bed because he kept getting out of bed at night; they were trying to keep him safe. Further, Little told Huegel that she was getting a doctor's order.

The Board of Appeals concluded that the installation of the lower bed rail was willful because it was not done by accident. But under former RCW 74.34.020(2), Huegel's deliberate action was willful only if he knew that the action would inflict *unreasonable* confinement. Under the facts of this case, any confinement inflicted by installation of the lower bed rail was not unreasonable. The Board also focused on the fact that the lower bed rail was not medically authorized. However, the lack of express medical authorization does not make installation of the lower bed rail an unreasonable confinement given the fact that the family requested the lower rail for WS's safety.

The Board also apparently concluded that Huegel employed an "improper use of restraint" because the lower bed rail was not medically authorized as required under former RCW 74.34.020(2)(e)(ii). However, former RCW 74.34.020(2)(e) did not state that an improper use of restraint occurs any time a mechanical restraint is not medically authorized. "Improper use of restraint" means the "*inappropriate*" use of mechanical restraints that are not medically authorized. Former RCW 74.34.020(2)(e) (emphasis added). The Board did not enter a finding of fact or conclusion of law that Huegel knowingly used an *inappropriate* mechanical restraint. And under the facts of this case, installation of the lower bed rail at the family's request with the understanding that medical authorization would be obtained was not inappropriate.

Huegel may have made a mistake in not waiting for the promised medical authorization before agreeing to the family's request that a lower bed rail be installed. But I would hold that the evidence does not support the Board's conclusion that Huegel willfully abused a vulnerable adult.

31

No. 59660-1-II

Therefore, I respectfully dissent.

MAXA, P.J.