IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

OTHELO QUILANG,                )
                                    )      No. 40731-4-III
          Respondent,        )
                                      )
     v.                               )
                                      )
WASHINGTON STATE OF       )      UNPUBLISHED OPINION
DEPARTMENT OF SOCIAL AND   )
HEALTH SERVICES,          )
                                      )
         Appellant.          )

COONEY, J. — Othelo Quilang was found to have abused a resident at a care facility where he was employed. Mr. Quilang and the Department of Social and Health Services (Department) filed various appeals concerning the findings of abuse, eventually bringing the issue before this court. In a published opinion, we vacated the Board of Appeal's (Board) finding of abuse and remanded for further proceedings.

The Board affirmed the finding of abuse following remand. Mr. Quilang appealed the Board's decision to the superior court. The superior court reversed the Board's

finding of abuse and reinstated the administrative law judge's (ALJ) decision that the

Department did not prove Mr. Quilang abused a vulnerable adult. The Department

appeals to this court.

On appeal, Mr. Quilang argues the Board's decision (1) misinterpreted or

misapplied the law, (2) is not supported by substantial evidence, and (3) is arbitrary and

capricious. Mr. Quilang further asserts he is entitled to attorney fees. We disagree with

Mr. Quilang's arguments and affirm the Board's finding of abuse.

## BACKGROUND

Judy[1] is a developmentally disabled, blind, and nonverbal adult who resided at

DreamWorks Residential Adult Family Home (DreamWorks). Judy was 61 years old in

2019, the time of the incident giving rise to this appeal. Her functional assessment stated

she had a history of self-harm, including self-inflicted head trauma. Judy also had a

history of "elbow banging" that caused bleeding. Clerk's Papers (CP) at 239.

To prevent Judy from harming herself, her functional assessment stated that fall

mats needed to be placed around her room. Additionally, pool noodles were placed on

"almost everything Judy uses" to provide padding and to prevent her from harming

herself. CP at 349. Her functional assessment stated staff should speak to her in a "calm

[and] reassuring voice" and refrain from touching her "without first speaking to her and

_____

[1] We use Judy's first name only to protect her confidentiality.

letting her know what [the staff] are going to do." CP at 242-43. The assessment further stated that when "Judy attempts head banging it is important to move her to safety immediately to prevent injury." CP at 243. The functional assessment listed "[t]hings that have been identified as working" to calm Judy and keep her from injuring herself and "[t]hings that do not work." CP at 243.

Mr. Quilang, a registered nurse assistant, began caring for Judy "eight hours a day from Monday to Friday" in 2013. CP at 318. Mr. Quilang was well regarded at DreamWorks and considered to be a good caretaker for Judy. Staff referred to Mr. Quilang as the "Judy whisperer" because he was good at keeping her calm. CP at 348. English is not Mr. Quilang's first language, and he was largely unfamiliar with Judy's functional assessment.

In 2019, Mr. Quilang noticed Judy was upset during the first hour of one of his shifts. At the time, Judy was seated in an armchair and banging her elbows on the upholstered arms of the chair. Another DreamWorks staff member, Amber Wicks, passed by Judy's room as Judy was banging her elbows and observed Mr. Quilang striking Judy in the face with a pool noodle. Ms. Wicks noted Judy was yelling and appeared agitated, notably due to Judy's blindness and the lack of verbal or visual cues from Mr. Quilang for the incoming strikes to her face with the pool noodle. Ms. Wicks took a video recording of Mr. Quilang hitting Judy in the face with the pool noodle and reported the incident to her manager, Katie Swan.

The silent video recording shows Mr. Quilang striking Judy in the face with the pool noodle 10 times. Ms. Wicks later testified she witnessed Mr. Quilang hit Judy "at least six or more" times. CP at 343. The recording shows Judy holding her face and rocking back and forth each time she is struck with the pool noodle.

Ms. Swan reviewed the video and immediately fired Mr. Quilang. Ms. Swan reported the incident to law enforcement, and Adult Protective Services (APS) received an intake report regarding the incident. The APS report noted that a staff member, presumably Ms. Wicks, saw Mr. Quilang look around "to see if anyone was watching" before hitting Judy. CP at 193.

APS investigated the incident and concluded Mr. Quilang's conduct constituted "physical abuse" against a vulnerable adult pursuant to chapter 74.34 RCW. CP at 184. The Department sent Mr. Quilang written notice of the finding. Mr. Quilang appealed the Department's finding to the Board and a hearing was held before an ALJ. The ALJ heard testimony from Ms. Wicks, Mr. Quilang, and the APS investigator. The video recording of the incident and the APS intake report were admitted at the hearing, among other exhibits. Mr. Quilang admitted during the hearing that he hit Judy with the pool noodle but contended he did not intend to "hurt her" and was instead trying to "protect her from her elbow[s]." CP at 322.

At the conclusion of the hearing, the ALJ entered an initial order finding Mr. Quilang's conduct did not constitute abuse of a vulnerable adult. The Department

4

petitioned the Board for review of the ALJ's decision. The Board subsequently reversed the ALJ and affirmed the Department's original finding of abuse. Mr. Quilang appealed the Board's decision to the superior court. The superior court upheld the Board's order and finding of abuse.

Mr. Quilang then appealed to this court. *Quilang v. Dep't of Soc. & Health Servs.*, 25 Wn. App. 2d 164, 527 P.3d 73 (2022). In a published opinion, we concluded the Board improperly conflated the "presumption of harm" with the "presumption of abuse," and the Board's order did not adequately explain the basis for its departure from the ALJ's factual findings. *Id.* at 176-80. We therefore vacated the Board's order and remanded for further proceedings. *Id.* at 184.

On remand, the Board again reviewed the ALJ's decision. The Board then entered a "Review Decision and Final Order on Remand"[2] that once more found Mr. Quilang physically abused Judy. CP at 28-46. Mr. Quilang appealed to the superior court. The superior court reversed the Board's final order on remand and reinstated the ALJ's finding that Mr. Quilang did not physically abuse Judy. The superior court also awarded Mr. Quilang attorney fees.

The Department appeals.

---

[2] The relevant findings and conclusions made by the Board are addressed in the analysis below.

ANALYSIS

The Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs review of agency actions. *Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 547, 389 P.3d 731 (2017). We review the final order of the Board rather than the initial order by the ALJ. *Verizon Nw., Inc. v. Emp. Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). When reviewing an agency action, "this court sits in the same position as the superior court, applying the standards of the WAPA directly to the record before the agency." *Tapper v. Emp. Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993); *Goldsmith v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 573, 584, 280 P.3d 1173 (2012). We will grant relief from an agency's final order only when one of nine statutory elements contained in RCW 34.05.570(3) is met.

In relevant part, RCW 34.05.570(3) provides:

> Review of agency order in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
>
> . . . .
>
> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
>
> . . . .
>
> (i) The order is arbitrary and capricious.

Mr. Quilang asserts the Board's order (1) erroneously interpreted and applied the law, (2) is not supported by substantial evidence, and (3) is arbitrary and capricious. RCW 34.05.570(3)(d), (3)(e), and (3)(i). Under the WAPA, the party asserting invalidity of the agency action bears the burden of showing the action is invalid. RCW 34.05.570(1)(a).

### WHETHER THE BOARD ERRONEOUSLY INTERPRETED OR APPLIED THE LAW

Mr. Quilang first argues the Board erroneously interpreted and misapplied the law, specifically the holdings in *Crosswhite*[3] and *Brown*,[4] and that it incorrectly relied on an unpublished and distinguishable case. RCW 34.05.570(3)(d). We agree with Mr. Quilang that the Board misstated the law but decline to reverse because Mr. Quilang fails to explain how this error alone warrants reversal, especially in light of the totality of the Board's findings of fact and conclusions of law.

Our review under RCW 34.05.570(3)(d) is de novo to determine whether the agency decision contains a legal error. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011). We "give the agency's interpretation of the law great weight where the statute is within the agency's special expertise." *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015).

---

[3] *Crosswhite*, 197 Wn. App. 539.

[4] *Brown v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 177, 185 P.3d 1210 (2008).

Mr. Quilang argues the Board misapplied the law by relying on *Mohamed v. Department of Social Health Services*[5] because it is nonbinding and distinguishable. He further contends the Board misstated and misapplied the holdings in *Crosswhite* and *Brown* and disregarded the distinction between nonaccidental and willful actions. Finally, Mr. Quilang argues the Department had to prove there was an intent to harm, and the Board erred in holding abuse only requires an intentional act, even if there was no intent to harm. Specifically, Mr. Quilang challenges conclusions of law 17 and 19.

The Board concluded following remand:

17. Next, the Department must show that [Mr. Quilang's] actions were willful. A willful action that inflicts injury or physical mistreatment is necessary to prove abuse. [*Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 389 P.3d 731 (2017).] The Courts have determined that an action is "willful" if "a person acts knowingly with respect to the material elements of the offense." [*State v. Bauer*, 92 Wn.2d 162, 168, 595 P.2d 544 (1979); *Bishop v. City of Spokane*, 142 Wn. App. 165, 171, 173 P.3d 318 (2007)]. If an action is nonaccidental, then it is willful. [*Crosswhite*, 197 Wn. App. at 533.].

. . . .

19. In *Mohamed v. Dep't of Soc. Health Servs.*, the court found Mohamed knowingly and willfully physically abused a vulnerable adult when she forcefully hit the vulnerable adult in the chest, causing them to fall to the ground, and have chest pain for several days. [*Mohamed v. Dep't of Soc. Health Servs.*, No. 77885-4-I (Filed on 3/4/2019) (unpublished)].

CP at 19-20.

---

[5] No. 77885-4-I, (Wash. Ct. App. Mar. 4, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/778854.pdf.

Mr. Quilang first contends the Board misstated a key holding in *Crosswhite* in conclusion of law 17.

In *Crosswhite*, this court interpreted the meaning of "willful" as used in the definition of "abuse" under former RCW 74.34.020(2) (2018). 197 Wn. App. at 551. The statute defined "abuse" as "the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult." Former RCW 74.34.020(2) (2018). This court interpreted "willful," as used in the statute, to mean the alleged perpetrator "knowingly inflict[s] injury, unreasonable confinement, intimidation, or punishment." *Crosswhite*, 197 Wn. App. at 544. The court concluded, "Applying this common definition of 'willfully,' an abuser must knowingly inflict injury, unreasonable confinement, intimidation or punishment." *Id.* at 551. It noted that this definition was "consistent with our decision in *Brown*, 145 Wn. App. at 183, 185 P.3d 1210" in which we held "'the definition of "abuse" . . . require[s] a willful action to inflict injury.'" *Id.* at 551, 553. The *Brown* court also stated that where an action is "protective, not injurious or ill-intended," it is not "abusive." 145 Wn. App. at 183.

In *Crosswhite*, we further analyzed the applicable Department regulation's definition of "willful" that stated, "'[T]he nonaccidental action or inaction by an alleged perpetrator that he/she knew or reasonably should have known could cause harm, injury or a negative outcome.'" 197 Wn. App. at 552 (quoting WAC 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). We

9

determined the term "nonaccidental" was "reasonably synonymous" with the term

"willful" as used in former RCW 74.34.020(2). *Id.* at 553. We explained,

> It is critical to properly identify the "knowing action" that must be
> nonaccidental, however. As previously discussed, under RCW
> 9A.08.010(4), "[a] requirement that an offense be committed wil[l]fully is
> satisfied if a person acts knowingly *with respect to the material elements of
> the offense.*" (Emphasis added.) Yelling at a vulnerable adult that is
> nonaccidental and that nonaccidentally inflicts a type of harm identified
> by RCW 74.34.020(2) is willful. Yelling that is nonaccidental but that
> causes a statutory harm *accidentally* or *without purpose* is not.

*Id.* Thus, we held, "The Department's use of 'nonaccidental' to define 'willful' is not

erroneous if properly construed to require knowing infliction of a statutory harm." *Id.* at

554.

Moreover, in our prior decision in this case, we noted "abuse" requires "at least

'reckless' action and, at the time of Mr. Quilang's conduct, required that he *knowingly*

inflict one of the statutory harms: injury, unreasonable confinement, intimidation, or

punishment." *Quilang*, 25 Wn. App. 2d at 176.

Mr. Quilang points out that, contrary to the Board's conclusion of law, a

nonaccidental action *can* cause an accidental harm. *Crosswhite*, 197 Wn. App. at 553. In

conclusion of law 17, the Board oversimplified the holdings of *Crosswhite* and concluded

that "[i]f an action is nonaccidental, then it is willful." CP at 19. The Board failed to

state the entirety of the test outlined in *Crosswhite*—that the conduct must be

nonaccidental *and* that the resulting harm was nonaccidentally inflicted. *Crosswhite*, 197 Wn. App. at 553. As a matter of law, conclusion of law 17 was erroneous.

Notwithstanding the misstatement of law in conclusion of law 17, the Board properly applied the *Crosswhite* holding in conclusions of law 28 and 29, which are unchallenged on appeal. In reliance on findings of fact 19 and 20, the Board concluded that Mr. Quilang's actions inflicted harm (Judy would become visibly upset and hold her face after being struck with the pool noodle). [6] The Board further concluded that the resulting harm was nonaccidental (Mr. Quilang was using the pool noodle "as a punishment to Judy for yelling or banging her elbows"). CP at 23. Though the Board's summary of the holding in *Crosswhite* was inaccurate, it is unclear why this error would warrant reversal given the totality of the Board's findings of fact and conclusions of law that demonstrate it applied the correct legal principles.

As to conclusion of law 19, Mr. Quilang contends the Board erroneously relied on *Mohamed* because it is an unpublished opinion and therefore nonbinding and distinguishable.

In *Mohamed*, APS concluded after an investigation that Ms. Mohamed physically and mentally abused H.J., a vulnerable adult. *Mohamed v. Dep't of Soc. Health Servs.*, No. 77885-4-I, slip op. at 5 (Wash. Ct. App. Mar. 4, 2019) (unpublished),

---

[6] Mr. Quilang does not challenge finding of fact 19 on appeal.

https://www.courts.wa.gov/opinions/pdf/778854.pdf. In that case, Ms. Mohamed "hit

[H.J.] and caused her to fall" after H.J. intervened in an argument between Ms. Mohamed

and her partner. *Id.* at 3. Ms. Mohamed was arrested as a result of that incident, and H.J.

was taken to the hospital. *Id.* H.J. also reported two other prior incidents in which Ms.

Mohamed yelled at and threatened her. *Id.* On appeal, Ms. Mohamed argued, in relevant

part, that there was insufficient evidence to support the determination of abuse. *Id.* at 8.

This court disagreed and affirmed. *Id.* at 13.

   Mr. Quilang argues that, in contrast to *Mohamed*, he had no history of violence

toward Judy nor any other vulnerable adult and that he acted with the intention of

protecting Judy, not harming her. Although the Board acknowledged *Mohamed*, it also

cited, summarized, and applied the published cases of *Brown* and *Karanjah v.

Department of Social & Health Services*,[7] in making its decision. Thus, even if

*Mohamed* is unpublished and distinguishable, it is of no consequence because the Board

properly relied on and applied other relevant cases in making its decision. Importantly,

those conclusions of law are not challenged.

   The Board misstated the law in conclusion of law 17, but Mr. Quilang fails to

explain why that error alone warrants reversal. It is Mr. Quilang's burden to prove the

---

   [7] 199 Wn. App. 903, 401 P.3d 381 (2017).

Board's action was invalid, and he fails to do so based on the totality of the Board's

findings of fact and conclusions of law.

WHETHER SUBSTANTIAL EVIDENCE EXISTS TO SUPPORT THE BOARD'S FINDINGS

Mr. Quilang next argues many of the Board's findings are not supported by

substantial evidence. RCW 34.05.570(3)(e). We disagree.

For challenges pursuant to RCW 34.05.570(3)(e), we review findings of fact to

determine whether there is "'a sufficient quantity of evidence to persuade a fair-minded

person of the truth or correctness of the order.'" *City of Redmond v. Cent. Puget Sound

Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v.

Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)). We review the

evidence in the light most favorable to "'the party who prevailed in the highest forum

that exercised fact-finding authority.'" *City of Univ. Place v. McGuire*, 144 Wn.2d 640,

652, 30 P.3d 453 (2001) (quoting S*tate ex rel. Lige & Wm. B. Dickson Co. v. County of

Pierce*, 65 Wn. App. 614, 618, 829 P.2d 217 (1992)). "The APA's directive that we

review whether an order is supported 'by evidence that is substantial when viewed in

light of the *whole record* before the court' requires us to look beyond whether there is

merely some evidence that supports the agency order." *Crosswhite*, 197 Wn. App. at 548

(quoting RCW 34.05.570(3)(e)). We defer to the Board's witness credibility and weight

of evidence determinations. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176

Wn. App. 555, 565, 309 P.3d 673 (2013).

Specifically, Mr. Quilang argues there is not substantial evidence to support that he acted with an intent to harm Judy. Mr. Quilang challenges findings of fact 3, 5, and 20 as well as alleged mislabeled findings of fact in conclusions of law 22 and 23.[8]

The Board found on remand, in relevant part:

> 3. Judy's functional assessment instructed staff on how to deal with Judy's self-injurious behavior. For example, if Judy begins to bang her head or elbows, a staff member needs to move her to a safe area where she cannot hurt herself and speak to her with a calm and reassuring voice letting her know she is a wonderful person deserving of love and respect. Further, the assessment includes a list of things that have been identified as working to keep Judy calm. They include verbally telling Judy you are present, not touching her without first speaking to her to let her know what you are going to do, and describing what you are going to do and including her in the activity. Specifically, the assessment states that "[t]ouching her before you tell her you are there and what you are going to do" does not work to calm Judy.
>
> . . . .
>
> 5. On March 29, 2019, one of [Mr. Quilang's] coworkers, Amber Wicks, passed by Judy's room and out of the corner of her eye she observed [him] hit Judy with a pool noodle. Ms. Wicks needed to assist another client, but afterwards she came back, grabbed her phone, and recorded [Mr. Quilang's] actions. She observed [him] look around to see if anyone was watching. She pretended to be clueless and while speaking with another coworker she recorded [Mr. Quilang] hit Judy with a pool noodle *at least six times.* Ms. Wicks estimated approximately 5-10 minutes passed between the time she first saw [Mr. Quilang] hit Judy to when she was able to start recording.

---

[8] The Department argues Mr. Quilang only devoted argument to a fraction of his challenged findings. However, Mr. Quilang cites to each challenged finding in his argument section and devotes sufficient argument to each for us to review his challenges.

. . . .

20. [Mr. Quilang's] testimony that he accidentally hit Judy in the face with the pool noodle when he was trying to place it under her arms was not credible. [Mr. Quilang's] testimony was not corroborated by the video or testimony of those who were present or watched the video of the incident. Instead, the pool noodle was used as a form of punishment, not to protect Judy. Moreover, [Mr. Quilang] was seen looking around to see if anyone was watching before hitting Judy with the pool noodle. Showing that he knew what he was doing was wrong.

First, the armchair Judy was sitting in had padded arms so there was little damage she could do by hitting it with her elbows. However, had protecting Judy been [Mr. Quilang's] intention, after the first time she was hit in the face, he would have found an alternative way to protect her elbows, such as his hands or a small pillow as he had done previously.

More concerning, Judy was hit in the face ***ten times*** in less than two minutes, and likely many more times as Ms. Wicks did not start recording until approximately 5-10 minutes after she first saw [Mr. Quilang] strike Judy. Further, in the video [Mr. Quilang] never places the pool noodle under her elbows as he testified he had done, nor does he place it horizontally across the armchair she was sitting in, as one would expect if he was trying to protect her elbows.

Lastly, [Mr. Quilang] was looking around to see if anyone was watching before he hit Judy with the pool noodle, showing he knew what he was doing was wrong. [Mr. Quilang] had motivation to craft a story that would help him get his job back and keep his caregiver license. On the other hand, Ms. Wicks had no motivation to falsify a report against [Mr. Quilang] and went so far as to record the incident because she knew she would not be believed.

CP at 8-9, 14-15.

Moreover, in what Mr. Quilang contends are findings of fact mislabeled as conclusions of law, the Board found:

15

22. In this case, [Mr. Quilang] claims he was attempting to protect Judy from hitting her elbows on the armrest. However, the video and evidence does not support this contention, nor was using a pool noodle to protect Judy's elbows part of her care plan. In fact, touching Judy without telling her first was specifically identified as something that upsets her. The assessment plan gave clear instructions on what to do if Judy started to harm herself and none of them included hitting her with a pool noodle.

23. Moreover, [Mr. Quilang's] actions were not protective like those in *Brown* or *Karanjah*. Judy was sitting in an armchair with padded arms, the only other person present in the room was [Mr. Quilang], and she was not causing a threat to him or harm to herself. The video shows the chair is padded and seems unlikely she could have caused much harm to herself if she was hitting her elbows. Further, [Mr. Quilang] never actually places the pool noodle under her elbows and is seen clearly swatting her in the face multiple times. If protecting Judy's elbows was [Mr. Quilang's] true intention, he would have placed the pool noodle across the armchair and moved it as needed. This never occurred in the video, nor did anyone other than [Mr. Quilang] testify it occurred. Lastly, [Mr. Quilang] was looking around to see if anyone was watching before he hit Judy with the pool noodle, showing that he knew what he was doing was wrong.

CP at 21-22.

As to finding of fact 3, Mr. Quilang argues there is not substantial evidence to suggest he did not touch Judy without first informing her of what he was going to do. Contrary to his argument, finding of fact 3 does not state Mr. Quilang touched Judy without first telling her what he was going to do. Instead, the finding explains what Judy's functional assessment instructed staff to do. Furthermore, it is supported by substantial evidence. Judy's functional assessment explained, "It is important to always use a calm cheerful voice when talking to Judy" and to "not touch her without first speaking to her and letting her know what [the staff] are going to do." CP at 242-43. As

16

the Board found, Judy's functional assessment explained how to calm her down and what to do if she began to harm herself. Finding of fact 3 is supported by substantial evidence.

Mr. Quilang also challenges finding of fact 5. He argues the Board's finding that he was "seen looking around to see if anyone was watching him" is uncorroborated by the video. Br. of Resp't at 36. However, the APS intake report stated someone, presumably Ms. Wicks since she was the only witness to the incident, "saw [Mr. Quilang] lean over to see if anyone was watching." CP at 193. On reply, Mr. Quilang argues Ms. Wicks' statements contained in the APS intake report are hearsay. However, Mr. Quilang never objected to the ALJ's or Board's consideration of the APS intake report below and Mr. Quilang did not raise the hearsay issue until reply. An issue raised for the first time in a reply brief is too late to warrant consideration. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992); *see also* RAP 2.5. Thus, Mr. Quilang's challenge to the APS intake report based on hearsay is unpreserved.

Notwithstanding the error preservation issue, evidence rules are relaxed during administrative hearings. RCW 34.05.452(1) states, "Evidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." The Board's finding that Mr. Quilang looked around to see if anyone was watching before striking Judy is supported by substantial evidence.

Next, Mr. Quilang challenges finding of fact 20. In particular, he argues though the Board found "there was little damage Judy could have done by hitting her elbows, because of the padded armchair," testimony reflected Judy could bang her elbows hard enough to cause bleeding. Br. of Resp't at 37. Mr. Quilang correctly points out that there was testimony at the hearing that Judy would sometimes "bang[ ] her elbows" to the point of bleeding. CP at 329. However, the video of the incident showed that the armchair Judy was sitting in had padded, upholstered arms. Thus, the Board's finding that Judy could not have caused serious harm to herself based on her elbows banging against the padded arms of her chair is supported by substantial evidence.

Finally, Mr. Quilang challenges portions of conclusions of law 22 and 23, which are actually findings of fact.[9] Specifically, he challenges the Board's findings that his actions were not protective of Judy.

Mislabeled conclusion of law 22 is supported by substantial evidence. The Board found, based on the video and evidence presented at the hearing, that Mr. Quilang's actions were not protective of Judy and that Mr. Quilang violated provisions of Judy's care plan by hitting her repeatedly with the poodle noodle. We decline to disturb the Board's finding that the video conflicted with Mr. Quilang's contention that he was using

---

[9] "[A] finding of fact erroneously described as a conclusion of law is reviewed as a finding of fact." *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

the pool noodle to protect Judy's elbows. The video recording depicted Mr. Quilang hitting Judy in the face with the pool noodle multiple times. The recording did not show Mr. Quilang attempting to place the pool noodle under Judy's elbows to protect them or otherwise using the pool noodle in a manner that would disrupt her elbow banging. Thus, the Board's finding that Mr. Quilang was not attempting to protect Judy's elbows by hitting her in the face with the pool noodle is supported by substantial evidence.

The Board's finding that Mr. Quilang violated Judy's care plan by touching her without telling her first is also supported. Judy's functional assessment states individuals should not "touch her without first speaking to her and letting her know what [they] are going to do." CP at 243. Though the recording has no sound, it can be inferred that Mr. Quilang did not inform Judy of what he was going to do before hitting her in face. Mr. Quilang hit Judy in the face rapidly and repeatedly with the pool noodle. There would have been little to no time for him to warn her he was going to hit her before doing so. Further, her functional assessment included information on what to do if Judy began self-harming. It explained effective actions to soothe Judy and actions to avoid when she is upset. Nothing in the functional assessment indicated hitting Judy to redirect her behavior was an acceptable action to be taken if she began self-harming. The Board's finding that Mr. Quilang violated Judy's care plan is supported by substantial evidence.

As to mislabeled conclusion of law 23, Mr. Quilang argues the Board's finding that his "actions were not protective" of Judy is not supported by substantial evidence.

19

Br. of Resp't at 36. As discussed above, the Board's findings in conclusion of law 23 that Judy could not cause substantial harm to her elbows in the padded armchair and that Mr. Quilang was seen looking around before striking Judy are supported. Moreover, the Board's finding that Mr. Quilang "never actually places the pool noodle under [Judy's] elbows and is seen clearly swatting her in the face" is supported by the video of the incident. CP at 43.

Mr. Quilang seems to take exception to the Board's conclusion that, unlike other cases, his actions were not protective of Judy. Based on the evidence presented, including the video recording of the incident, the Board could find that Mr. Quilang's actions were inconsistent with his contention that he was trying to protect Judy's elbows. This largely boils down to a credibility finding that we will not disturb on appeal. The Board did not believe that Mr. Quilang was trying to protect Judy or that he was trying to use the pool noodle to prevent her from banging her elbows. As the Board noted, Mr. Quilang repeatedly hit Judy in the face with the pool noodle and appeared to make no effort to use the pool noodle as a barrier between Judy's elbows and the armchair. The findings in mislabeled conclusion of law 23 are supported by substantial evidence.

The Board's findings are supported by substantial evidence.

WHETHER THE BOARD'S DECISION WAS ARBITRARY AND CAPRICIOUS

Finally, Mr. Quilang argues the Board's decision was arbitrary and capricious because it failed to correctly interpret and apply *Crosswhite*. RCW 34.05.570(3)(i). We disagree.

For challenges under RCW 34.05.570(3)(i), we apply the arbitrary and capricious standard of review to determine whether the decision constitutes "'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.'" *Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991) (quoting *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)). "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Id.*

First, Mr. Quilang's arbitrary and capricious challenge is really the same as his argument above that the Board erroneously interpreted and applied the law. Second, Mr. Quilang does not explain how the Board's erroneous interpretation of *Crosswhite* could render its entire decision as arbitrary and capricious. Indeed, the Board considered the facts and circumstances surrounding the incident and investigation and its decision was not willful and unreasoning.

The Board's decision was not arbitrary and capricious.

WHETHER MR. QUILANG IS ENTITLED TO ATTORNEY FEES

Mr. Quilang argues he is entitled to an award of attorney fees at the appellate level and that we should affirm the superior court's award of attorney fees pursuant to RAP 18.1 and RCW 4.84.340-.360. Because Mr. Quilang is not a prevailing party, we decline to award him attorney fees. For the same reason, we reverse the superior court's award of attorney fees to Mr. Quilang.

Under the Equal Access to Justice Act:

> Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. A qualified party shall be considered to have prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.

RCW 4.84.350(1). A "qualified party" is "an individual whose net worth did not exceed one million dollars at the time the initial petition for judicial review was filed." RCW 4.84.340(5)(a).

Here, Mr. Quilang is not entitled to attorney fees because he has not prevailed in this appeal. Further, the superior court's award of attorney fees must be reversed because we reverse the superior court's decision and reinstate the Board's order on appeal.

No. 40731-4-III
*Quilang v. Dep't of Soc. & Health Servs.*

CONCLUSION

We affirm the Board's finding of abuse, reverse the superior court's award of attorney fees in favor of Mr. Quilang, and deny Mr. Quilang's request for attorney fees on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Murphy, J.

23